SATURN AIRWAYS, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Dan-Air Services, Ltd., et al., Intervenors.

Lynn Michelle TSCHIRHART and Paul
Jeffrey Tschirhart, Petitioners,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Americans For Charter Travel et al.,
Intervenors.

NATIONAL AIR CARRIER ASSO-
CIATION, INC., et al., Petitioners,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Dan-Air Services, Ltd., et al.,
Intervenors.

TRANSWORLD AIRLINES, INC.,
Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Lynn M. Tschirhart et al., Intervenors.

PAN AMERICAN WORLD AIRWAYS
INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

National Air Carrier Association,
Inc., et al., Intervenors.

AMERICAN AIRLINES, INC.,
Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

National Air Carrier Association,
Inc., et al., Intervenors.

AMERICAN SOCIETY OF TRAVEL
AGENTS, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

National Air Carrier Association, Inc.
and Overseas National Air-
ways, Inc.,

Saturn Airways, Inc., et al., Intervenors.

MASTER EXECUTIVE COUNCIL OF the
AIR LINE PILOTS IN the EMPLOY
OF UNITED AIR LINES, INC., Peti-
tioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

National Air Carrier Association,
Inc., et al., Intervenors.

Nos. 72-1904, 72-1905, 72-1908, 72-2042 to
72-2044, 72-2127 and 72-2129.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 24, 1973.

Decided July 11, 1973.

See also, 155 U.S.App.D.C. 151, 476
F.2d 907.

———◆———

Robert M. Lichtman, Washington, D. C., with whom Jerry D. Anker, Washington, D.C., was on the brief, for petitioners in Nos. 72–1904 and 72–1908 and intervenor National Air Carrier Assn., Inc., et al., in Nos. 72–2042, 72–2043, 72–2044, 72–2127 and 72–2129. Paul M. Ruden and Paul Y. Seligson, Washington, D.C., also entered appearances for petitioners in Nos. 72–1904 and 72–1905.

Harold L. Warner, Jr., New York City, of the bar of the Court of Appeals of New York pro hac vice by special leave of Court, with whom Edmund E. Harvey and Jerry W. Ryan, New York City, were on the brief for petitioners in Nos. 72–2042, 72–2043, and 72–2044.

Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, C. A. B., with whom Thomas E. Kauper, Asst. Atty. Gen., R. Tenney Johnson, General Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Alan R. Demby, and Arnold Lav, Attys., C. A. B., were on the brief for respondent.

Paul Y. Seligson, Washington, D.C., was on the brief for petitioners in No. 72–1905.

Charles A. Hobbs and Paul S. Quinn, Washington, D.C., were on the brief for petitioners in No. 72–2127.

Richard F. Watt, Chicago, Ill., was on the brief for petitioners in No. 72–2129.

Lester M. Bridgeman and Jeffrey M. Lang, Washington, D.C., were on the brief for intervenor, Dan-Air Services, Ltd., in Nos. 72–1904, 72–1908, 72–2042 and 72–2043.

Benny L. Kass, Washington, D.C., was on the brief for intervenor, Americans for Charter Travel, in Nos. 72–1904, 72–1905, 72–1908, 72–2042, 72–2043 and 72–2044.

Theodore I. Seamon, Joseph D. Sullivan and Lawrence D. Wasko, Washing-

ton, D.C., were on the brief for intervenor, Capitol International Airways, Inc., in Nos. 72–1904, 72–1905, 72–1908, 72–2042, 72–2043, 72–2044, 72–2127 and 72–2129.

Sanford Peyser, New York City, filed a brief on behalf of Louis J. Lefkowitz, Atty. Gen., of the State of New York, as amicus curiae urging affirmance.

Howard E. Shapiro, Atty., Department of Justice, entered an appearance for the United States of America.

John W. Simpson, Koteen & Burt, Washington, D. C., entered an appearance for intervenor, McCulloch International Airlines, Inc., in No. 72–1904.

Edmund E. Harvey, New York City, entered an appearance for intervenors, Braniff Airways, Inc. et. al., in Nos. 72–2042, 72–2043 and 72–2044.

Before TAMM and ROBB, Circuit Judges, and DAVIES,* Senior United States District Judge for the District of North Dakota.

TAMM, Circuit Judge:

"This case presents essentially a question of statutory construction. It grows out of the protracted and absorbing battle over the years between the regularly scheduled airlines and the so-called 'supplemental' airlines." Almost seven years ago we introduced our opinion in American Airlines, Inc. v. CAB, 125 U.S.App. D.C. 6, 365 F.2d 939, 940 (1966), with those two sentences; we find them an equally appropriate preface to today's decision. The passage of time has soured rather than mellowed the pugnacious disposition of the scheduled and supplemental airlines, and we are once again called upon to exercise our judgment concerning the "liberalization" (if

that beleaguered term is indeed appropos) of regulations governing the jurisdiction of supplemental air carriers to provide "charter trips . . . in air transportation." 49 U.S.C. § 1301(34) (1970).

On January 7, 1972, the Civil Aeronautics Board [hereinafter "Board"] published a Notice of Proposed Rule Making in the Federal Register, 37 Fed.Reg. 222 (1972), proposing and submitting for public comment a new set of regulations which provided for a new type of charter in air transportation, "Travel Group Charter" [hereinafter "TGC"].[1] As the TGC proposed regulations were somewhat revolutionary in concept—they relied upon travel factors rather than non-travel affinity to distinguish the charters from individually ticketed travel—they understandably elicited a deluge of analysis and discussion.[2] On September 27, 1972, following oral argument and the reception and analysis of comments from interested parties, the Board by a 3–2 vote adopted the proposed regulations with some modification. 37 Fed.Reg. 20808 (1972). These consolidated appeals are taken by several interested parties and raise many different issues regarding the legality of various aspects of the Board's action. We find that the Board acted within the scope of its authority and was neither arbitrary, unreasonable, nor capricious in the promulgation of the TGC regulations, and consequently in all respects affirm the Board.

I

Supplemental air carriers are those certificated by the Board pursuant to a finding of public convenience and necessity to engage solely in "supplemental

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. The Board on January 29, 1971, had previously issued an Advance Notice of Proposed Rule Making—Non-Affinity Charters. 36 Fed.Reg. 2514 (1971). The Advance Notice resulted from a petition for rule making filed by the Member Carriers of the National Air Carrier Associa-

tion (an organization of supplemental air carriers) on July 30, 1970.

2. A listing of the initial and reply comments was filed with the majority statement accompanying the adoption of the Travel Group Charter regulations, and appears at page 679 of the Joint Appendix filed with this appeal.

air transportation," 49 U.S.C. § 1371(d)(3) (1970), which is basically defined as "charter trips . . . in air transportation." 49 U.S.C. § 1301(34) (1970). The act of Congress providing for such certification, passed in 1962,[3] purposefully avoided a delineation of the term "charter trips," leaving the Board with the task of "evolv[ing] a definition in relation to such variable factors as changing needs and changing aircraft . . . ." American Airlines, Inc. v. CAB, 121 U.S.App.D.C. 120, 348 F.2d 349, 354 (1965). In the past decade the Board has responded to the challenge in a painstaking, almost evolutionary process of developing comprehensive regulations which authorize various types of charter flights. See 14 C.F.R. § 208.6. These include (1) "single-entity" charters, which involve engagement of an aircraft by one person for the transportation of others who pay nothing; (2) "affinity" charters, where groups having some community of interest apart from transportation, for example membership in a club, engage an aircraft for transportation to be paid for on a pro rata basis; (3) "inclusive tour charters," which involve the charter of an aircraft by an entrepreneur who offers space to the public as part of an all expense paid tour; and (4) "travel group charters," where individual travelers without a community of interest apart from transportation are organized by a third party and, subject to certain travel related restrictions, charter an aircraft on a pro rata basis.[4]

The supplemental air carriers, once known as "non-scheduled" or "irregular" air carriers, are meant to provide a supplementary service to that of the scheduled or trunkline carriers, who offer individually ticketed, regularly scheduled service to the general public.[5] Since the supplementals are not subject to the economic rigors attendant upon a regularly scheduled, individually ticketed service, for they essentially fly when they desire and nearly always carry a full planeload of passengers, the air fares for comparable routes on charter flights can be significantly less than those offered by the scheduled air carriers.[6] Congress in providing for certification of the supplementals recognized the potential problem of competition and the real possibility that if not carefully controlled they would supplant, rather than supplement, the regularly scheduled service. See generally American Airlines, Inc. v. CAB, supra, 365 F.2d at 944–945. Individually ticketed, regularly scheduled service is the mainstay of an efficient air transportation system, and a critical

3. Act of July 10, 1962, Pub.L. No. 87–528, 76 Stat. 143, amending the Federal Aviation Act of 1958, 72 Stat. 731, as amended, 49 U.S.C. § 1301 et seq. (1970).

4. There are also "study group charters," 14 C.F.R. §§ 373.1–.31, and "overseas military personel charters," 14 C.F.R. §§ 372.1–.40.

5. Trans World Airlines, Pan American World Airways, American Airlines, Braniff Airways, Delta Air Lines, Eastern Air Lines, National Airlines, Northwest Airlines, United Air Lines, and Western Air Lines are all certified pursuant to 49 U.S.C. § 1371(d)(1) (1970), and thus are representative scheduled or trunkline air carriers.

It is important to note that 49 U.S.C. § 1371(e)(6) (1970) provides that "[a]ny air carrier, other than a supplemental air carrier, may perform charter trips . . . or any other special service . . . ." Therefore, the scheduled air carriers can, should they so desire, compete with the supplemental air carriers in the charter travel market.

6. The scheduled air carriers providing individually ticketed transportation, because they provide the country with a "dependable and predictable air transportation service at all times, one that operates in peak and off-peak periods, to large cities and to small ones and in dense and thin traffic markets," Brief for Petitioners and Intervenors in Nos. 72–2042, 2043, 2044 at 6, are admittedly at an economic disadvantage when competing against charter services. Whereas the "load factor" (average percentage of occupancy) of charter flights is near 100 percent, scheduled service normally operates at an average of 50 percent. See Comments of Trans World Airlines, Inc. in Opposition to the Travel Group Charter Proposal, Jt. App. at 423.

necessity in any sophisticated economy. Congress realized that it must be preserved. Accordingly, the legislative history[7] and language of the statute itself[8] manifest a congressional intent that although the Board should have the power of definition, it should never permit "individually ticketed service to be offered to the general public under the guise of charter." Sen.Rep.No.688, 87th Cong., 1st Sess. 13 (1961).

It is thus with each successive modification of the charter service regulations that the scheduled air carriers, asserting that the indistinct line between group (charter) and individually ticketed travel has been crossed, raise strong opposition to their implementation. The TGC regulations have proven to be no exception to that pattern of behavior. A brief summary of the past struggles between the supplemental and scheduled air carriers, who evidently view their respective positions as unalterably antagonistic, should serve to place this current litigation in proper perspective and render invaluable assistance in determining its outcome.

### 1. Split Charters

In early 1964 the Board revised part 295 of its Economic Regulations and included what are known as "split charters" within the definition of charter flights. See ER–408, 29 Fed.Reg. 6005

(1964). Split charters, generally speaking, are the process whereby each of two unrelated but qualified charter groups with similar destinations charter one half of the same aircraft.[9] Three scheduled air carriers petitioned in this court for review of that action, asserting that the Board lacked the statutory authority to define "charter trips" in such a manner—such charters were not authorized at the time of passage of the 1962 statutory revision—and that even if redefinition powers were found to exist, because of serious diversion of carriage from the scheduled services the Board abused its discretion in so acting. This court, speaking through Judge [now Chief Justice] Burger, disagreed, and in so doing laid the foundation for future decisions. American Airlines, Inc. v. CAB, 121 U.S.App.D.C. 120, 348 F.2d 349 (1965) [hereinafter "American Airlines I"]. The court stated:

We conclude Congress intended, although not without limits, that the Board should be free to evolve a definition in relation to such variable factors as changing needs and changing aircraft; whatever the limits on the Board's power of definition, those limits are not breached by a definition which permits two groups to charter one half an aircraft each . . . . We agree with the Board that the legislative history reveals that a prime

---

7. See generally the thorough analysis of the legislative history contained in American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939 (1966), and Pan American World Airways, Inc. v. CAB, 380 F.2d 770 (2d Cir. 1967), aff'd by an equally divided Court, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968).

8. The Act of September 26, 1968, Pub.L. No. 90–514, 82 Stat. 867, amending 49 U.S.C. § 1301(33) (1964) (codified at 49 U.S.C. § 1301(34) (1970)), amended the definition of supplemental air transportation by providing, inter alia, that "[n]othing in this paragraph shall permit a supplemental air carrier to sell or offer for sale an inclusive tour in air transportation by selling or offering for sale individual tickets directly to members of the general public . . . ."

9. On March 26, 1968, the Board again altered part 295 of its Economic Regulations, "by deleting the [then] existing rigid requirement that each group be comprised of one-half of the capacity of an aircraft and substituting therefore [a] more flexible requirement . . . namely, authorization of up to three groups on one aircraft with each group containing 40 or more passengers." Reg. ER–531, Amdt. 1, 33 Fed.Reg. 5155 (1968). Subsequently, on January 29, 1971, the Board deleted part 295, incorporating it into part 208, and eliminated the limitation on number of groups per aircraft, while retaining the minimum passengers per group requirement. Reg. ER–659, Amdt. 9, 36 Fed.Reg. 2486 (1971). See 14 C.F.R. § 208.6(c). Both alterations were subjected to stiff opposition by the scheduled airlines.

concern of Congress was to maintain the integrity of the charter concept— to preserve the distinction between group and individually ticketed travel; within these limits it is for the Board to evolve reasonable definitions.

*Id.* at 354.[10]

### 2. *Inclusive Tour Charters*

Further scrutiny of the Board's authority was not long in coming, for on March 11, 1966, the Board issued certificates of authority granting certain supplemental airlines the right to operate "inclusive tour charters" in both domestic and transatlantic markets.[11] The regulations promulgated concurrent therewith defined an inclusive tour charter as a kind of all-expense paid tour, with restrictions such as a seven day minimum between departure and return, a minimum of three stops, and a requirement that the tour package price be no less than 110 percent of the lowest available fare charged by the scheduled air carriers for comparable individually ticketed travel.[12]

The Board action was challenged by certain scheduled air carriers who sought review in this court as to the domestic charters, American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939 (1966) [hereinafter *"American Airlines II"*], and in the second circuit court of appeals as to the transatlantic charters. Pan American World Airways, Inc. v. CAB, 380 F.2d 770 (2d Cir.

1967), aff'd by an equally divided Court, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968). Although *American Airlines I* had settled the question of the Board's basic power to evolve changing definitions of charter, the scheduled air carriers questioned whether the Board had exceeded the limits of this authority by failing to maintain the individually ticketed—group fair distinction that Congress desired. This line of attack required the courts to take a hard look at congressional intent in the passage of the 1962 legislation.

In *American Airlines II* this court stated what it found to be the three primary purposes of the 1962 legislation: (1) to eliminate irresponsible supplementals; (2) to stabilize the operating authority of the supplementals under certification, including authority to authorize charter trips on a broad enough basis so that the supplementals might remain economically viable organizations capable of meeting supplemental transportation needs and high safety standards; and (3) "to maintain the regulatory scheme of the Federal Aviation Act and the protection of the [scheduled] carriers . . . by eliminating unregulated individually ticketed point-to-point competition from the supplementals." 365 F.2d at 945–946 (footnote omitted). It was to the third of these purposes that the contradictory references in committee reports, hearing transcripts, and floor speeches of Congressmen were directed.[13] The court

---

10. The court continued, 348 F.2d at 354, in language we find relevant to the TGC controversy:

    In today's swift engineering developments as to size and speed of aircraft a definition embalmed, for example, in such origins as the admiralty law growing out of the sailing vessel era would be an unreasonable and unnecessary restraint on the Board and one we do not find in the statute or its history.

11. *See generally* Board Order E–23350 (March 11, 1966), *and* Reg. No. SPR–14, 31 Fed.Reg. 4779 (1966).

12. The regulations governing inclusive tour charters are contained in part 378 of the

Board's Economic Regulations, 14 C.F.R. §§ 378.1–.31.

13. The bill which evolved into the Act of July 10, 1962, Pub.L. No. 87–528, 76 Stat. 143, was prepared by the Board and introduced in both houses of Congress early in the 87th Congress. *See* S.1969, 87th Cong., 1st Sess. (1961); H.R. 7318, 87th Cong., 1st Sess. (1961). Following lengthy committee hearings and floor argument the Senate and House versions of the bill became strikingly different—the Senate version attempted a definition of "charter service," one which prevented individually ticketed service excepting that offered to "a member of a group on an all-

felt, however, that much of the concern over the specific authorization of inclusive tour charters arose because of the abuses experienced when, prior to 1962, the Board had granted supplemental air carriers the right to conduct ten flights per month of scheduled, individually ticketed carriage. "Groups of carriers would combine their operations and provide daily services claiming at least color of authority under the ten-flight per month authorization." 365 F.2d at 945. The court then summarized the problem:

> The question therefore arises as to whether authorization of inclusive tour charters will in fact bring about the individually ticketed abuses experienced under the ten-trip-per-month authority. . . . In order to insure that the supplementals were properly regulated in this respect, and to insure that the individual ticketing abuses would not occur, the Board issued stringent regulations at the time of its decision in the instant case to cover inclusive tour charters. The key to this case, we believe, is the fact that the Congress at the time it passed the legislation had no way of knowing specifically how the Board would regulate the actions of the supplementals with respect to inclusive tour charters.

365 F.2d at 946 (footnote omitted). Finding that the stringent regulations promulgated by the Board would in fact preclude the abuses both experienced in the past and foreseen by the legislators, we concluded that the inclusive tour charter regulations maintained the important distinction between group and individually ticketed travel, and therefore upheld the Board's action.

On September 27, 1966, two months following the issuance of *American Airlines II*, presidential approval was given to the transatlantic aspects of the inclusive tour charter authorizations. As we noted earlier, review was immediately sought in the second circuit court of appeals by certain scheduled airlines, challenging the Board's action in the international arena upon the same grounds that had earlier been contested in *American Airlines II*. The second circuit, although of course looking to the same legislative history that we had analyzed several months earlier, reached a contrary conclusion:

> We . . . reject the argument that the legislators' concern was with abuses growing out of the Board's prior practice of allowing supplemental carriers to perform limited scheduled individually ticketed travel. Regardless of the extent to which there may have been legislative concern based on this prior experience, indeed whether or not the expression of concern was misguided or wholly unwarranted, it was in fact manifested in a congressional declaration binding on both the Board and this court, that was clearly intended to forbid the Board to authorize inclusive tours.

380 F.2d at 781.

The Supreme Court's effort to relieve this conflict between the circuits was far from totally successful, for its consideration of the *Pan American* decision resulted only in a per curiam affirmance by an equally divided court. World Airways, Inc. v. Pan American World Airways, Inc., 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968). Although an affirmance by an equally divided Supreme

---

expense-paid tour," while the House version contained no definition whatsoever. The conflicting bills were submitted to a Conference Committee which reported out a substitute bill adopting the House version, and eliminating the definition of "charter" found in the Senate bill. This bill was ultimately enacted into law.

As both Pan American World Airways,

Inc. v. CAB, 380 F.2d 770, 777–782 (2d Cir. 1967), aff'd by an equally divided Court, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968), and American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939, 941–949 (1966), contain extensive analysis of conflicts in the legislative history, we find it unnecessary to repeat the discussion here.

Court is not "entitled to precedential weight," Neil v. Biggers, 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401, (1972), its restricted effect was to affirm the second circuit's decision, and thus while domestic inclusive tours were allowed by this court's decision, transatlantic inclusive tours were forbidden. Accordingly, Congress quickly passed legislation which expressly included inclusive tour charters within the definition of supplemental air transportation. Act of September 26, 1968, Pub.L. No. 90–514, 82 Stat. 867, amending 49 U.S.C. § 1301(33) (1964) (codified at 49 U.S.C. § 1301(34) (1970)).[14] We note that the Senate and House committee reports enunciated that the purpose of the new legislation was to "clarify" rather than add to the authority of the Board as originally granted in the 1962 legislation.[15]

## II

■ We have analyzed the record in light of the history—both litigious and legislative—of charter air travel. We adhere to the analysis and conclusions of our *American Airlines II* decision, and find that in authorizing the TGCs the Board met its obligations to encourage "[t]he promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices," pursuant to the mandate of 49 U.S.C. § 1302(c) (1970), and to maintain the legislatively desired distinction between individually ticketed and group travel.

We want to stress two items that have particularly influenced us, and which we have drawn from our review of this case and other experiences with this type of litigation. First, the test we must apply is result oriented—one cannot really know how the public will react and how the TGCs will affect scheduled travel until they are tested in the crucible of the marketplace. This is a situation in which, in Judge Leventhal's words, "a month of experience will be worth a year of hearings." American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 633 (D.C.Cir.), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). We can only look to the record, contradictory legislative history, and the purposes of the enabling legislation itself to determine if the Board's action is reasonable, and within its authority. We are loathe to be held out either as seers of the future or overseers of the air transportation system in this country. Secondly, the consistent lamentations and predictions of doom by diver-

14. Section (1) of Pub.L. 90–514 reads:
    Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That paragraph (33) of section 101 of the Federal Aviation Act of 1958 is amended to read as follows:
    "(33) 'Supplemental air transportation' means charter trips, including inclusive tour charter trips, in air transportation, other than the transportation of mail by aircraft, rendered pursuant to a certificate of public convenience and necessity issued pursuant to section 401 (d)(3) of this Act to supplement the scheduled service authorized by certificates of public convenience and necessity issued pursuant to sections 401(d) (1) and (2) of this Act. Nothing in this paragraph shall permit a supplemental air carrier to sell or offer for sale an inclusive tour in air transportation by selling or offering for sale individual tickets directly to members of the general public, or to do so indirectly by controlling, being controlled by, or under common control with, a person authorized by the Board to make such sales."

15. *See* S.Rep. No. 1354, 90th Cong., 2d Sess. 2 (1968): "S.3566 would clarify Congress intent," and 8: "The bill would reaffirm the previous position taken by this committee that inclusive tour charter trips are in the public interest and that supplemental air carriers should have the authority to conduct them." *See also* H. Rep. No. 1639, 90th Cong., 2d Sess. 2 (1968), U.S.Code Cong. & Admin.News 1968, p. 3595: "The bill would amend the Federal Aviation Act of 1958 . . . to clarify Congress' intent that inclusive tour charter trips do not permit individually ticketed service by supplemental air carriers . . . ." and 4 U.S.Code Cong. & Admin.News 1968, p. 3596: "The CAB's authority is clarified, not enlarged here."

sion raised by the scheduled air carriers in the past have proved, to our way of thinking, to be considerably overstated. The actions of the Board in this area have provided for steady growth in both the scheduled and supplemental markets. and the public, as it should be, has been the primary beneficiary.[16]

An elaboration of the intricacies of the TGC regulations would serve little purpose. We have studied them carefully and find that they maintain the necessary distinction between group and individually ticketed travel, and that they are the result of painstaking and reasoned analysis by the Board. We are impressed with the five "substantial and vital" differences between TGCs and conventional travel that have been stressed by the Board in its argument before us: (1) The TGC traveler is a party to the charter contract itself, incurring liability for the pro rata share of the charter cost and running the risk that his cost may increase depending upon the load factor ultimately achieved. (2) The travel group must be formed no less than three months prior to the scheduled departure time, or the trip must be cancelled. (3) The members of the group formed in # 2 above must have paid a deposit of 25 percent of the minimum pro rata charter price before the time for filing the list of tour members with the Board has elapsed, no more than four nor less than three months prior to the scheduled departure. This deposit is, subject to certain exceptions, nonrefundable. Payment of the balance must then be made not later than two months before departure. As of then the participant risks, again subject to certain exceptions, a 100 percent forfeiture should he desire to change his plans. (4) There is a risk of cancellation of the flight up to 45 days prior to scheduled departure because of defaults by fellow charter participants. (5) All TGC participants must go and return as a group, subject to predetermined, fixed restrictions as to the length of the trip.[17]

Perhaps the primary reason for the extensive opposition to the TGCs on the part of the scheduled air carriers is that the TGCs do not require non-travel related "affinity." Non-travel affinity, whereby members of an organization such as the Elks or Eagles Club are allowed to take advantage of charter fares through charters organized by their clubs, have proven to be discriminatory in application and difficult in enforcement.[18] The Board correctly rec-

16. The tremendous growth of the air transportation system—in the last decade both in the individually ticketed and group fare markets—is a well known phenomenon. The record is replete with charts and graphs showing rapid and steady growth in passenger numbers, passenger miles, and revenues. This growth has been accompanied in general with a reduction in rates—certainly in the transatlantic market. Trans World Airways, Inc. in a comment filed before the Commission in opposition to the TGCs stated that a round trip fare between New York and London which cost $675.00 in 1951 was set at $277.00 in 1971. Jt. App. at 99.

17. The TGC regulations comprise part 372a of the Board's Economic Regulations, 14 C.F.R. §§ 372a.1–.50.

18. The majority of the Board in its statement accompanying the enactment of the TGC regulations, Reg. SPR–61, 37 Fed. Reg. 20808 (1972), noted these two factors as the prime moving force for the TGC proposals:

The proposal stemmed from two principal factors: (1) the Board's growing concern that our existing rules, limiting charter travel to groups having a "prior affinity," tended to discriminate against members of the public who did not belong to qualified organizations with a membership large enough to successfully mount a charter program; and (2) the fact that our existing rules had proven to be extremely difficult to enforce. We recognized that these two factors are closely interrelated, in that the operators of illegal charters have been satisfying an ever increasing demand for low-cost charter travel by members of the public who simply do not share the kind of "affinity" required by our existing rules. We therefore tentatively concluded that it would be desirable to authorize travel charters for groups which, while having no "prior affinity" based on nontransportation considerations, could nonetheless have a true affinity arising solely from the special terms and conditions governing their transportation arrangements.

ognized that this non-travel "affinity" was not statutorily required, but only a vehicle to insure that charter travel did not become a guise for individually ticketed services. So long as such organizational membership is not necessary to insure the distinction—which can be and is maintained by travel related restrictions in both the inclusive tour and now in the TGC charters—it is not a *sine qua non* for legality.

▮ Finally, we find nothing at fault with the Board's decision to forego an evidentiary hearing on the diversionary effects of the TGC authorizations. The Board stated that "insofar as the principal factual issues here involve largely unpredictable questions as to the traffic which these new rules will generate or cause to be diverted from scheduled carriers, they can best be resolved in light of experience gained through actual experimentation." 37 Fed.Reg. 20811 (1972). The TGC regulations and authorizations are temporary in nature, with a termination date set for December 31, 1975. 14 C.F.R. § 372a.5. This is the best way to test the true effects of the TGCs, and the Board remains free at all times to adjust its regulations in the interim to adapt to unexpected results. The Board's experience with charter definitions in the past and the comments and oral arguments submitted to it led it to believe that this experimentation approach was the proper manner in which to proceed. We cannot fault such an approach.[19] *See* American Airlines, Inc. v. CAB, *supra,* 359 F.2d at

633, *and* Delta Air Lines, Inc. v. CAB, 147 U.S.App.D.C. 272, 455 F.2d 1340, 1344 (1971).

III

▮ Several supplemental air carriers and the National Air Carrier Association, Inc., a trade association of the supplementals, challenge the TGC regulations from an understandably different posture. They urge us not to set aside any specific section of the regulations under review, but rather to remand to the Board for the limited purpose of reconsidering its requirement that the TGCs be marketed exclusively by independent charter organizers.[20]

The charter organizer is an "arranger." He initially obtains an option from the air carrier which obligates it to enter into a contract to provide carriage, said contract to be entered into with the organizer as agent for the group he subsequently forms. The organizer is given a substantial administrative burden of filing contracts, passenger lists, etcetera, with the Board, and it is through his organizational abilities and solicitation of the charter group that the charter will ultimately succeed or fail. His compensation is in the form of a service charge from the charter group, which is pro rated among its members. He must be completely independent of, and receive no compensation from any air carrier.[21]

▮ The Board's reason for requiring an independent organizer is almost

---

*See* Brief for Attorney General of the State of New York as Amicus Curiae, where authorization of TGCs is urged, for discussion of the tremendous difficulties experienced in attempting to adequately enforce the "affinity" regulations.

Affinity is an elusive concept. Of course, to the extent that it is used in the question-begging sense of denoting the commonality of interest in group travel which distinguishes such from individually ticketed travel, affinity is preserved by the stringent regulations of both the TGC and inclusive tour regulations.

19. The scheduled air carriers' contention that a hearing should otherwise be held

as a matter of right because the Board's action amounts to altering, amending or modifying certificates of public convenience within the scope and intent of 49 U.S.C. §§ 1371(g) and 1372(f) (1970) is rejected. *See* Dan-Air Services, Ltd. v. CAB, 154 U.S.App.D.C. 297, 475 F.2d 408 (March 15, 1973).

20. The additional challenge raised by the supplementals in Nos. 72–1904, 72–1908, and by petitioners Tschirhart in No. 72–1905 that the Board was arbitrary in disallowing special rates for children on TGCs is without merit.

21. *See generally* 14 C.F.R. §§ 372a.20–.31.

disarmingly simple—it is a further mechanism for separating the supplemental air carrier from the marketing of individual tickets to the general public. In light of Congress' specific prohibition in the inclusive tour market, 49 U.S.C. § 1301(34) (1970):

> Nothing in this paragraph shall permit a supplemental air carrier to sell or offer for sale an inclusive tour . . . by selling . . . individual tickets directly to members of the general public, or to do so indirectly by controlling . . . a person authorized by the Board to make such sales.

We find this requirement to be eminently reasonable.[22]

Accordingly, the various Orders of the Civil Aeronautics Board authorizing Travel Group Charters and promulgating regulations concerning such, are

Affirmed.

22. *See* 114 Cong.Rec. 25060–62 (1968) (debate concerning amendment offered by Rep. Blatnik).