R. Norlan **DAUGHTREY** et
al., Appellants,

v.

Jimmy **CARTER** et al.

No. 77–1702.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 1978.

Decided July 25, 1978.

---

Benjamin C. Flannagan, IV, Atty., Dept. of Justice, Washington, D. C., with whom George W. Calhoun and Lubomyr M. Jach-

nycky, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

James T. McKenna, Washington, D. C., a member of the bar of the Supreme Court of New York, by special leave of court, pro hac vice, with whom Louis Wilson Ingram, Jr., was on the brief, for appellants.

Before TAMM and ROBB, Circuit Judges, and DAVIES,* United States Senior District Judge for the District of North Dakota.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

Appellants brought suit in the United States District Court for the District of Columbia seeking declaratory and injunctive relief against the operation of the Presidential Proclamation entitled Granting Pardon for Violations of the Selective Service Act, August 4, 1964 to March 28, 1973,[1] and the Executive Order implementing that Proclamation,[2] both of which were signed by President Carter on January 21, 1977. The district court (Corcoran, J.) dismissed the complaint for lack of standing to sue on the ground that appellants failed to allege injury in fact.[3] We affirm.

## I

On the day following his inauguration, President Carter issued the following Proclamation: [4]

### GRANTING PARDON FOR VIOLATIONS OF THE SELECTIVE SERVICE ACT, AUGUST 4, 1964 TO MARCH 28, 1973

### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

Acting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States, I, Jimmy Carter, President of the United States, do hereby grant a full, complete and unconditional pardon to: (1) all persons who may have committed any offense between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act or any rule or regulation promulgated thereunder; and (2) all persons heretofore convicted, irrespective of the date of conviction, of any offense committed between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act, or any rule or regulation promulgated thereunder, restoring to them full political, civil and other rights.

This pardon does not apply to the following who are specifically excluded therefrom:

(1) All persons convicted of or who may have committed any offense in violation of the Military Selective Service Act, or any rule or regulation promulgated thereunder, involving force or violence; and

(2) All persons convicted of or who may have committed any offense in violation of the Military Selective Service Act, or any rule or regulation promulgated thereunder, in connection with duties or responsibilities arising out of employment as agents, officers or employees of the Military Selective Service System.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of January, in the year of our Lord nineteen hundred and seventy-seven, and of the Independence of the United States of America the two hundred and first.

/s/ Jimmy Carter

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Pres.Proc. No. 4,483, 42 Fed.Reg. 4,391 (1977).

2. Exec.Order No. 11,967, 42 Fed.Reg. 4,393 (1977).

3. Record entry (R.E.) 9, 10.

4. See note 1 supra.

In order to implement the Proclamation, the President issued the following Executive Order:[5]

## RELATING TO VIOLATIONS OF THE SELECTIVE SERVICE ACT, AUGUST 4, 1964 TO MARCH 28, 1973

The following actions shall be taken to facilitate Presidential Proclamation of Pardon of January 21, 1977:

1. The Attorney General shall cause to be dismissed with prejudice to the government all pending indictments for violations of the Military Selective Service Act alleged to have occurred between August 4, 1964 and March 28, 1973 with the exception of the following:

(a) Those cases alleging acts of force or violence deemed to be so serious by the Attorney General as to warrant continued prosecution; and

(b) Those cases alleging acts in violation of the Military Selective Service Act by agents, employees or officers of the Selective Service System arising out of such employment.

2. The Attorney General shall terminate all investigations now pending and shall not initiate further investigations alleging violations of the Military Selective Service Act between August 4, 1964 and March 28, 1973, with the exception of the following:

(a) Those cases involving allegations of force or violence deemed to be so serious by the Attorney General as to warrant continued investigation, or possible prosecution; and

(b) Those cases alleging acts in violation of the Military Selective Service Act by agents, employees or officers of the Selective Service System arising out of such employment.

3. Any person who is or may be precluded from reentering the United States under 8 U.S.C. 1182(a)(22) or under any other law, by reason of having committed or apparently committed any violation of the Military Selective Service Act shall be permitted as any other alien to reenter the United States.

The Attorney General is directed to exercise his discretion under 8 U.S.C. 1182(d)(5) or other applicable law to permit the reentry of such persons under the same terms and conditions as any other alien.

This shall not include anyone who falls into the exceptions of paragraphs 1(a) and (b) and 2(a) and (b) above.

4. Any individual offered conditional clemency or granted a pardon or other clemency under Executive Order 11803 or Presidential Proclamation 4313, dated September 16, 1974, shall receive the full measure of relief afforded by this program if they are otherwise qualified under the terms of this Executive Order.

/s/ Jimmy Carter

THE WHITE HOUSE,
    January 21, 1977.

Appellants, who describe themselves as twelve retired military officers and enlisted men, one active duty military officer, one civilian former prisoner of war, the minor child of a prisoner of war who died in captivity, one civilian, wives of two of the military appellants, and two members of the United States House of Representatives,[6] filed this action against the President and the Attorney General seeking a declaratory judgment and injunction restraining the operation of the Presidential Proclamation and the Executive Order.[7] Although appellants challenge the Presidential Proclamation and Executive Order on multiple grounds, their principal contention is that the President exceeded the limits of his constitutional pardon power,[8] and usurped the power of Congress,[9] by directing the Attorney General to violate 8 U.S.C. § 1182 (1976), which states, in pertinent part:

---

**5.** *See* note 2 *supra.*

**6.** Appellants' Brief at 4.

**7.** *See* R.E. 1.

**8.** U.S.Const. art. II, § 2, cl. 1.

**9.** *See generally id.* art. I.

(a) . . . the following classes of aliens . . . shall be excluded from admission into the United States:

. . . . .

(22) Aliens who are ineligible to citizenship, except aliens seeking to enter as nonimmigrants; or persons who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency, except aliens who were at the time of such departure nonimmigrant aliens and who seek to reenter the United States as nonimmigrants.

Appellants contend that the unlawful entry into the United States of persons who remained outside or left this country to avoid military service necessarily results in a dilution of their right to vote.[10] In the district court, appellants averred that 198 persons had entered the United States in violation of section 1182(a)(22),[11] but at oral argument, counsel for appellants suggested that the number of such persons entering this country may be in the thousands.

Appellants contended in the district court that persons who left or remained outside of the United States to avoid military service lost their citizenship by operation of law, and that the President unlawfully restored political rights to such persons.[12]

However, appellees argued that appellants apparently relied upon a provision, 8 U.S.C. § 1481(a)(10) (1970),[13] that has been repealed.[14] See National Emergencies Act, Pub.L.No. 94–412, § 501(a)(1) & (2), 90 Stat. 1255, 1258 (1976).[15]

Appellants apparently do not now rely on their original assertion that persons who left or remained outside the United States to avoid military service became aliens by operation of law. Instead, they contend that the Presidential Proclamation and Executive Order restore full political rights, including voting rights to such persons, and that such persons are ineligible for restoration of such rights under 8 U.S.C. § 1182(a)(22).[16]

Appellants additionally allege that the Executive Order accomplished either an unlawful delegation of the pardon power to the Attorney General, or a suspension of provisions of the Military Selective Service Act, codified in scattered sections of titles 10, 37, and 50 App. of the *United States Code* (1976, 1970 & Supp. V 1975), in cases involving force and violence that the Attorney General deems not serious.[17] They contend that the Attorney General is violating 8 U.S.C. § 1182(d)(5) (1976), by failing to impose conditions of parole on persons entering the United States under provisions of the Presidential Proclamation and Execu-

10. R.E. 1 ¶ XVII.

11. R.E. 8, at 2–3.

12. R.E. 1 ¶ XI.

13. 8 U.S.C. § 1481(a)(10) (1970) provided, in pertinent part:
"[A] person who is a national of the United States . . . shall lose his nationality by . . . departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States."

14. R.E. 7, at 2 n.3.

15. The repealed section had provided explicitly for loss of nationality by any national of the United States who departed from or remained outside of this country during war or presidentially declared national emergency for the purpose of avoiding military service. Congress' repeal followed the Supreme Court's decision that the section was unconstitutional. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *See* S.Rep.No.94–1168, 94th Cong., 2d Sess. 6 (1976); U.S.Code Cong. & Admin.News 1976, p. 2288. In *Kennedy*, the Supreme Court held that the automatic deprivation of citizenship as a penalty for leaving or staying outside the country to avoid military service was unconstitutional because it did not afford the procedural safeguards guaranteed by the fifth and sixth amendments. 372 U.S. at 165–66, 83 S.Ct. 554.

16. *See* Reply Brief for Plaintiffs-Appellants at 1, 5.

17. R.E. 1 ¶¶ XII, XIV.

tive Order.[18] Appellants also contend that the Proclamation and Executive Order are void because they invidiously discriminate among classes of potential recipients of the pardon.[19]

Appellants sought a declaration that the Presidential Proclamation and Executive Order are void on the foregoing grounds, as well as a broad declaration that "[t]he Congress alone has the power to declare the manner of acquiring, losing or reacquiring citizenship; . . . [e]xcept as to recipients of [the] Presidential Pardon, the penal provisions of the United States Code, wherever codified, are and remain in full force and effect; and . . . [t]he President has absolute pardon power over every offense against the United States excepting only impeachment."[20] Appellants asked the district court to enjoin the Attorney General "from giving effect to so much of the Executive Order of January 21, 1977 as suspends the effect of the Military Selective Service Act . . . and the effect of the Aliens and Nationality Act."[21] In the alternative, appellants asked the court to order the Attorney General to conduct a hearing with respect to each person claiming eligibility for the pardon to determine whether the pardon applies to him and whether it restores to him full political rights.[22]

## II

■ In reviewing the dismissal of appellants' complaint for lack of standing, we accept the material allegations of the complaint as true and construe those allegations in appellants' favor. *Warth v. Seldin*, 422

U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343, (1975).[23] Appellants have alleged three possible bases for standing: (1) as eligible voters, they are injured by the dilution of their votes necessarily resulting from the alleged unlawful entry of persons into the United States and restoration of full political rights to such persons; (2) as Congressmen, two appellants are injured by the President's usurpation of their lawmaking power; (3) as citizens, appellants are injured by the Attorney General's failure to enforce the law.

### A.

■ Appellants allege that their voting rights are diluted by the unlawful entry into the United States of persons excluded from entry under 8 U.S.C. § 1182(a)(22) and the resulting exercise of full political rights by such persons.[24] Appellants recognize that the actual number of such persons is unknown but allege that the number may be in the thousands. *See* text *supra* at pp. ––––––––– of 190 U.S.App.D.C., pp. 1053–1054 of 584 F.2d.

Appellants predicate their standing to sue squarely on *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[25] In that landmark decision, the Supreme Court held that qualified voters of various Tennessee counties had standing to attack on allegedly unconstitutional statewide apportionment scheme. *Id.* at 204–08, 82 S.Ct. 691. The Court ruled that the plaintiffs in *Baker* stated " 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' " *id.* at 208, 82 S.Ct. 691, 705 (quoting *Coleman v. Miller*, 307 U.S. 433, 438, 59

18. *Id.* ¶ XVI.

19. *Id.* ¶ XV.

20. *Id.* ¶ XIX.

21. *Id.* ¶ XXIII.

22. *Id.* ¶ XVII.

23. Appellees contend that the interpretation given 8 U.S.C. § 1182(a)(22) (1976) by appellants would render it unconstitutional, and suggested in their brief and at oral argument that this court need not accept the correctness of appellants' interpretation in ruling upon their

standing to sue. We do not consider the constitutionality of the statute under appellants' interpretation because the question of standing is preliminary to questions going to the merits of the controversy. *Blackhawk Heating & Plumbing Co. v. Driver*, 140 U.S.App.D.C. 31, 38 n.9, 433 F.2d 1137, 1144 n.9 (1970); *see Harrington v. Bush*, 180 U.S.App.D.C. 45, 58 n. 62, 553 F.2d 190, 203 n.62 (1977).

24. Reply Brief for Plaintiffs-Appellants at 1–3.

25. Appellants' Brief at 6–8.

S.Ct. 972, 83 L.Ed. 1385 (1939)), by alleging that the apportionment scheme "disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-à-vis* voters in irrationally favored counties." 369 U.S. at 207–08, 82 S.Ct. at 705.

In *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 223 n.13, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974), the Supreme Court again recognized that "a concrete injury to fundamental voting rights" can satisfy the injury in fact requirement for standing. In more recent years, a number of cases have assumed that an alleged dilution of voting rights may be sufficient injury to confer standing. *See, e. g., United Jewish Organizations v. Carey*, 430 U.S. 144, 152–53, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (principal opinion) (White, J.); *Creel v. Freeman*, 531 F.2d 286, 286–89 (5th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); *Locklear v. North Carolina State Board of Elections*, 514 F.2d 1152, 1152–56 (4th Cir. 1975).

■■■ However, in our opinion, *Baker v. Carr* does not make every alleged dilution of voting rights a sufficient injury to confer standing. In each case, "[t]he determination [of] injury must necessarily proceed on an *ad hoc* scrutiny of the facts." *Harrington v. Bush*, 180 U.S.App.D.C. 45, 61, 553 F.2d 190, 206 (1977). Our examination of the allegations in this case convinces us that appellants have not stated an "injury in fact," the first and foremost element of standing in federal court. *Association of Data Processing Service Organizations v.*

*Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *see Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 at 218, 227 n.16, 94 S.Ct. 2925, 41 L.Ed.2d 706; *American Society of Travel Agents v. Blumenthal*, 157 U.S.App.D.C. 281, 566 F.2d 145, 148 (1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

Appellants reside in various localities across the United States.[26] They do not contend that their votes are diluted in any particular election or in any particular geographical area, nor do they contend that they are an identifiable group of voters whose votes are disfavored *vis-à-vis* those of some other group.[27] At best, the complaint can be read to claim that as qualified voters of political subdivisions anywhere in the United States, appellants' votes in elections for any office, whether national, state, or local, are being diluted as a result of the reentry into the United States of an admittedly unknown, relatively small number of persons who allegedly should be excluded, and who therefore should not be entitled to vote. We believe that appellants have failed to allege injury sufficient for standing in federal court because they have not presented a "discrete factual context" within which "concrete injury" occurred. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 220–22, 94 S.Ct. 2925. Moreover, the dilution of voting rights they have alleged is so diffuse, minute, and indeterminable that we must conclude the injury asserted is "too speculative to support standing under the circumstances presented here." *American Society of*

---

**26.** According to the complaint, appellants reside in Albuquerque, New Mexico; Los Angeles, Redwood City, and Belmont, California; Ford, Virginia Beach, Arlington, Norfolk, and Alexandria, Virginia; Elgin, Florida; San Antonio, Texas; Iowa City, Iowa; Upper Marlboro, Maryland; Fayetteville, North Carolina; Sioux Falls, South Dakota; and Pocatello, Idaho. R.E. 1 preceding ¶ 1.

**27.** *Cf. United Jewish Organizations v. Carey*, 430 U.S. 144, 152–53, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (principal opinion) (White, J.) (voters of Hasidic Jewish community alleged that county redistricting plan would dilute their

franchise by half); *Wesberry v. Sanders*, 376 U.S. 1, 2, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (voters of Georgia's fifth congressional district alleged their Congressman represented two to three times as many people as those in other districts); *Leser v. Garnett*, 258 U.S. 130, 135–36, 42 S.Ct. 217, 66 L.Ed. 505 (1922) (qualified male voter of State of Maryland challenged registration of female voters in Baltimore City); *Creel v. Freeman*, 531 F.2d 286, 286–89 (5th Cir. 1976) (noncity voters of county alleged that participation of city voters in school board election diluted noncity votes), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977).

*Travel Agents v. Blumenthal,* 157 U.S.App. D.C. at 285, 566 F.2d at 149; *see Massachusetts v. Mellon,* 262 U.S. 447, 486–87, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

■ One of the purposes of requiring concrete injury in a discrete factual context is to ensure that broad constitutional adjudication such as that requested in this case "does not take place unnecessarily." *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. at 221, 94 S.Ct. 2925. The appellants in this case have not alleged "such a personal stake in the outcome of the controversy," *Baker v. Carr,* 369 U.S. at 204, 82 S.Ct. at 703, as would justify exercise of the court's remedial powers on their behalf. *Warth v. Seldin,* 422 U.S. at 498–99, 95 S.Ct. 2197.

### B.

Two appellants, George Hansen, a United States Congressman from Idaho, and Lawrence McDonald, a United States Congressman from Georgia, base their standing to sue on the alleged "usurpation of the legislative power conferred upon them and their fellow legislators by the Constitution."[28] This usurpation, appellants contend, consists of the de facto repeal of acts of Congress that results from the failure of the executive branch to enforce the laws.[29] Although appellants presented a slightly broader claim to the district court,[30] they now limit their challenge to the failure of the Attorney General to enforce provisions of the Immigration and Nationality Act, codified in 8 U.S.C. §§ 1101–1503 and scattered sections of titles 18, 22, 31, 49, and 50 App. of the *United States Code* (1976, 1970 & Supp. V 1975).[31]

■ Although injuries suffered by legislators may be different from those of other litigants, the manner of analyzing such injuries for standing purposes is the same.

*Harrington v. Bush,* 180 U.S.App.D.C. at 59, 553 F.2d at 204. Thus we must determine whether the two congressional appellants have asserted a judicially cognizable injury in fact. *Id.* at 205–06. In *Harrington,* this court held that post-enactment impropriety in the administration of laws does not usurp the lawmaking power of an individual Congressman, and that an allegation of "post-enactment illegality" does not state an injury in fact to an individual Congressman's law-making function. 553 F.2d at 213; *accord, Metcalf v. National Petroleum Council,* 180 U.S.App.D.C. 31, 40, 553 F.2d 176, 185 (1977). Unlike the Congressman in *Harrington,* appellants do not contend that they actually voted for the legislation that is the subject of this suit. *See* 180 U.S.App. D.C. at 58–59, 553 F.2d at 203–04. Their argument at best, can be read to allege either that through nonenforcement, the President has usurped their power to enact repealing legislation, or that as Congressmen, they have a unique interest in ensuring that congressional enactments are enforced. Both of these contentions are without merit.

■ The failure or refusal of the executive branch to execute accomplished legislation does not affect the legal status of such legislation; nor does it invade, usurp, or infringe upon a Congressman's power to make law. *See Harrington v. Bush,* 180 U.S.App.D.C. at 67–68, 553 F.2d at 212–13. Once a bill becomes law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public. *Harrington v. Schlesinger,* 528 F.2d 455, 459 (4th Cir. 1975); *accord, Harrington v. Bush,* 180 U.S. App.D.C. at 68, 553 F.2d at 213. Thus, in this case, the injury suffered by the congressional appellants is in no way unique to their status as legislators.

---

28. R.E. 1 ¶ XVI. Since appellants do not allege they have been authorized to prosecute this suit by the House of Representatives, they therefore sue derivatively in their capacity as individual members of that institution. *Harrington v. Bush,* 553 F.2d at 199 n. 41.

29. R.E. 1 ¶¶ XIII–XIV, XVI.

30. *Id.* ¶¶ XII–XIV, XVI.

31. Appellants' Brief at 10. Appellants do not base their standing on an interest in the enforcement of any criminal laws. *Id.*

As we discuss in the following section, this generalized interest of all citizens in proper administration of the law lacks the specificity essential for standing.[32]

### C.

 Appellants contend that the Attorney General has abdicated his responsibility to enforce the Immigration and Nationality Act, and has thereby violated their right to have the laws enforced.[33]  However, appellants' asserted interest in the proper administration of the laws is a generalized one shared by all other citizens.  Such abstract injury is insufficient for standing.  *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 217, 219–21, 94 S.Ct. 2925, 41 L.Ed.2d 706.

In *Reservists*, the Supreme Court held that standing to sue may not be predicated upon an interest that is held in common by all members of the public, such as is present in this case.  *Id.* at 220, 226–27, 94 S.Ct. 2925.  Although the proper administration of the laws serves the interests of all, "[t]he proposition that all [laws] are enforceable by any citizen simply because citizens are the ultimate beneficiaries . . . has no boundaries."  *Id.* at 226–27, 94 S.Ct. at 2935.  In the absence of concrete injury to appellants resulting from the refusal of the executive branch to carry out provisions of the Immigration and Nationality Act, appellants lack standing.[34]

### CONCLUSION

Because none of appellants alleged injury in fact, the district court properly dismissed the complaint for lack of standing to sue.[35]

*Affirmed.*

---

**32.** Although the potential existence of an alternative course of action does not affect standing, we note that the congressional appellants may have a remedy in the legislative process. If a majority of both houses of Congress disagree with the President's interpretation and application of the relevant statutory provisions, Congress has the resources to ascertain the facts and clarify or "tighten [such statutes] if that be [its] will." *Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975); *see Harrington v. Bush*, 180 U.S.App.D.C. at 70, 553 F.2d at 215.

**33.** R.E. 1 ¶ XXII.  The Attorney General is charged with the administration and enforcement of this Act under 8 U.S.C. § 1103(a) (1976).

**34.** Although we do not doubt the appellants' motivation to pursue this action, motivation can not substitute for the injury needed "to focus litigation efforts and judicial decision making." *Schlesinger v. Reservists Comm. to Stop The War*, 418 U.S. 208, 226, 94 S.Ct. at 2935 (1974).

**35.** Because none of appellants has alleged injury in fact to himself or herself, we need not decide whether appellants could have asserted the equal protection and vagueness objections of potential recipients of the pardon. *See generally Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).