**TRANS INTERNATIONAL AIRLINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 23111.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1969.

Decided April 27, 1970.

Mr. Walter D. Hansen, Washington, D. C., with whom Mr. Clayton L. Burwell, Washington, D. C., was on the brief, for petitioner.

Mr. J. Michael Roach, Atty., Civil Aeronautics Board, with whom Messrs. Joseph B. Goldman, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, Civil Aeronautics Board, and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for appellee. Mr. Irwin Seibel, Atty., Dept. of Justice, also entered an appearance for respondent.

Before McGOWAN, ROBINSON and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

This is a statutory review proceeding involving an order of the Civil Aeronautics Board. Petitioner Trans International Airlines, Inc., (TIA) is a supplemental air carrier and, as such, is authorized only to engage in charter operations. It asserts that the Board's order under review improperly denied it the right to offer its charter services to the stockholders of its parent company, Transamerica Corporation. We have considered TIA's claims of unacceptable arbitrariness on the part of the Board, and we find no warrant to disturb the Board's action.

I

In February of 1968 Transamerica Corporation acquired Trans International Airlines, a supplemental air carrier.

Transamerica is a large conglomerate which, through subsidiaries, engages in a variety of business enterprises. It has 150,000,000 shares of authorized stock, of which some 65,000,000 are presently outstanding in the hands of about 140,000 shareholders. Soon thereafter Transamerica and TIA began to discuss the possibility of establishing pro rata transatlantic charter flights for the shareholders of Transamerica. A pro rata charter is defined in the Board's regulations as one involving the division of cost among the passengers. 14 C.F.R. 295.2(c).

The scope of the services that a supplemental air carrier can offer is determined by the meaning of "charter" in Section 101(33) of the Federal Aviation Act (49 U.S.C. § 1301(33)), the text of which is set forth in the margin.[1] Part 295 of the Board's Economic Regulations is addressed to transatlantic supplemental air transportation, and it embodies the Board's attempt to distinguish between service offered to the general public, on the one hand, and to more restricted groups, on the other. Only the latter are eligible for charter transportation.

Early in 1968, TIA's legal counsel opined that the Transamerica shareholders were eligible, under the Board's regulations, for charter service. On the basis of this opinion, Transamerica in July of 1968 began to solicit its registered shareholders for a series of charters it had planned.

In August of 1968, Delta Air Lines, a scheduled air carrier, wrote the Board's General Counsel to inquire as to the charterworthiness of the Transamerica shareholders.[2] The General Counsel responded that "usually the shareholders of a widely held public corporation will not possess a sufficiently unifying relationship to set them apart from the general public." After this, the Board's Bureau of Enforcement wrote TIA to suggest that TIA's charter flights might violate the Board's regulations.

On January 21, 1969, TIA filed a petition, pursuant to 14 C.F.R. 295.60, seeking a declaratory judgment that the Transamerica shareholders were charterworthy, or, in the alternative, a waiver of the regulations to permit operation of the flights already planned.

During the pendency of this petition, the Government of Belgium wrote the Board to determine whether TIA's proposed flights were valid, apparently intending to refuse landing rights if they were not. Because TIA feared that the Board would respond that the flights were probably in violation of the regulations, TIA petitioned that an emergency exemption be granted to authorize the operation of the five planned flights pending the determination of its declaratory judgment petition.

1. "Supplemental air transportation" means charter trips, including inclusive tour charter trips, in air transportation, other than the transportation of mail by aircraft, rendered pursuant to certificate of public convenience and necessity issued pursuant to section 401 (d) (3) of this Act to supplement the scheduled service authorized by certificates of public convenience and necessity issued pursuant to sections 401(d) (1) and (2) of this Act. Nothing in this paragraph shall permit a supplemental air carrier to sell or offer for sale an inclusive tour in air transportation by selling or offering for sale individual tickets directly to members of the general public, or to do so indirectly by controlling, being controlled by, or under common control with, a person authorized by the Board to make such sales.

2. Delta's letter quoted from a report by Transamerica to its shareholders of the acquisition of TIA, and the resulting availability of TIA's charter services to Transamerica's shareholders. Delta characterized Transamerica's reference to its shareholders as an "affinity group" within the Board's regulations as an "unusual definition." Delta noted that, although it had received frequent inquiries from its own and other stockholders with respect to charter service, it had always taken the position "a stockholder is not, on that basis alone, a 'member' of his company in the sense that one would have to be a member of a charter organization in order to qualify for charter transportation."

The Board dealt with both of these petitions in its order of May 27, 1969. It declared that the Transamerica shareholders were not charterworthy. It granted the emergency exemption for two flights, but denied it for the three flights more remote in time. TIA's complaint about the order here is directed to its declaration that the shareholders of Transamerica are not eligible for charter service.

## II

It was recognized by both parties in oral argument before us that Congress has given the Board a singularly clean slate upon which to write its conception of charter services, subject always to what we have heretofore characterized as the "prime concern of Congress * * to maintain the integrity of the charter concept—to preserve the distinction between group and individually ticketed travel. * * * " [3] TIA does not contend that in this instance the Board has promulgated an invalid regulation in the sense of one conflicting with, or exceeding the bounds of, the statutory authority conferred upon the Board. It does urge that the Board's application of its regulation in this case is so at odds with the language of the regulation itself, and with other applications of that language, as to constitute unacceptably arbitrary and irrational agency action. It embodies essentially the same point in an alternative argument that the Board's order amounts in substance to an amendment of its regulation without due compliance with the Administrative Procedure Act.

The operative words relevant to the issue before us are scattered through the definitions section (295.2) of Part 295. The scheme of that section is to limit a "charter flight" to a "charter group"

derived from a "charter organization." "Charter organization" is, however, defined only as the entity from whose members a "charter group" is drawn, and there is no effort in terms to define directly what a "charter organization" is. The section then addresses itself to the *bona fides* of membership in a "charter organization," and defines "bona fide members" as those "who have not joined the organization merely to participate in the charter as a result of solicitation directed to the general public." [4] "Solicitation of the general public" is then defined to mean either (1) a "solicitation going beyond the bona fide members of an organization," or (2) the "solicitation, without limitation, of the members of an organization so constituted as to ease of admission to membership, and nature of membership, as to be in substance more in the nature of a segment of the public than a private entity."

The Board's regulation has, thus, the difficulties inherent in any tangential approach to definition. It is obvious that what constitutes a proper charter organization, on the one hand, and what constitutes bona fide membership by an individual in that organization, on the other, can be separate questions with diverging criteria. The Board's failure to differentiate between these two concepts as sharply as it might has enabled petitioner to argue that the only elements requisite for a qualified charter organization are that (1) it maintain a central membership list and (2) participation in charter flights be limited to such members as have (a) not joined merely to take charter flights as a result of solicitation directed to the general public, and (b) been members (i) for six months prior to the first charter flight date and (ii) prior to the announcement of firm charter plans by the organization. TIA

---

3. American Airlines, Inc. v. CAB, 121 U. S.App.D.C. 120, 125, 348 F.2d 349, 354 (1965). See also American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939 (1966).

4. The regulation goes on to state a presumption against *bona fides* in the case

of persons who are not members of the charter organization at the time it first gives notice of its firm charter plans and who have not been members for at least six months prior to the starting flight date.

urges that its stockholder register meets the first such principal requirement, and that the second is satisfied by its own requirements in its announced plans that eligible stockholders must have been on that register at least six months prior to the announcement.

The Board argues that this is all very well so far as it goes, but that it leaves wholly out of account the considerations which distinguish (1) a group of people having an affinity of interest or relationship from (2) the populace at large; and it points in this regard to that part of its regulation which discountenances the solicitation of the members of an organization which is itself "so constituted as to ease of admission to membership, and nature of membership, as to be in substance more in the nature of a segment of the public than a private entity." The Board reminds in this connection of the plain Congressional purpose not to permit the charter concept to swallow up the basic unit of the transportation market in the person of the individually ticketed passenger.

TIA does not, it seems to us, utterly deny the force of this conceded Congressional purpose or that, in consequence thereof, the Board has reflected the affinity concept in its regulations. Its insistence rather is that, at least since the formulation of Board policy in the Transatlantic Charter Investigation, 40 CAB 233 (1964), the qualification of individual persons as bona fide members of an organization thereby establishes the qualification of the organization itself in respect of the necessary affinity.

The *Transatlantic Charter Investigation* was a proceeding to consider, *inter alia*, the amendment of Part 295 of the Board's Economic Regulations to delete

a provision limiting "charterworthiness" to groups with a membership less than 20,000.[5] TIA cites the following language of the Board in that case to further its argument:

"However, we are of the opinion that at this juncture the 6-month membership requirement of section 295.30 reinforced, as it will be, by mandatory maintenance of membership lists, constitutes a sufficiently substantial restriction of charter flights to the general public so as to render the numerical limitation unnecessary. The record indicates that the present effect of this requirement is largely to foreclose bona fide organizations from engaging charter programs. * * * "

This language, and the resulting order, certainly effect the removal of a requirement—the 20,000 ceiling. And this particular language does seem to rely solely upon the six-months' membership, and the membership list, requirements. But other excerpts suggest that the Board would continue to determine whether an organization is adequately distinguishable from the general public in terms of affinity, regardless of size, as well as whether the particular members going on the trip are bona fide members:

This provision [the membership list] will aid the Board and the carrier in determining whether participants in a pro rata charter are bona fide members of a *group eligible to charter*, as distinguished from the general public. [emphasis added]

The Board throughout used the phrase "bona fide organization," which, as remarked above, is not the same thing as "bona fide member," and the trial examiner, whose opinion the Board adopted, used the Lions Club and the British Bar

---

5. Before this amendment to delete the 20,000 limit, there was a provision excepting from this limit "business entities, government departments or agencies, colleges and universities." TIA argues that under this exception (referred to by it as the "business entity doctrine") they were a charterworthy group even before the *Transatlantic Charter Investigation*. It appears, however, that the Board intended this exception to apply to employees, as distinguished from shareholders, of a business entity. "With regard to the 20,000 membership limitation, we feel that exemption therefrom for charters premised on employment by a business or Government entity is inherently desirable. * * * " IATA Charter Agreement, 38 CAB 1054 (1963).

Association as examples of groups larger than 20,000 that should be charter-worthy, since these groups would surely meet the affinity requirement as well.

It does not appear to us, therefore, that the regulations emerging from the *Transatlantic Charter Investigation* abandoned any policy of requiring a distinctive internal relationship between members of an organization, which would set them apart from the world at large, as an essential qualification of the organization itself. Indeed, the Board could not have done so without putting itself in conflict with the Congressional purposes underlying the authorization of charter service. Assuming, then, that the Board has by regulation set up a standard of examining the constitution of an organization by reference to "ease of admission to membership" and "nature of membership" to see whether it is "in substance more in the nature of a segment of the public than a private entity," we turn to TIA's alternative contention that that standard has been arbitrarily applied.

TIA asserts that the Board has decided the other way on a set of facts on all fours with the present case, and that arbitrariness thereby resides in this discriminatory application of the Board's regulations. These are the so-called *Greenbelt* cases, which involved charter flights for the members of Greenbelt Consumer Services, a company operating 41 consumer cooperatives.[6] For affinity purposes, it is said that there is no difference between the members of a cooperative and the shareholders of a public corporation, at least in terms of ease of entry to membership, or of how frequently the members function as a group rather than individually.[7]

Whatever apparent force there may be in analogizing cooperative memberships to corporate shareholdings, the Board insists that it made no explicit determination in the *Greenbelt* cases that cooperatives are charter organizations within the regulations. Both *Greenbelt* cases were applications to exempt the supplemental carrier there involved from Section 401 of the Federal Aviation Act, so that it might perform four transatlantic charters even though it was not certificated for overseas air transportation. The Board addressed itself only to matters relevant to this Section 401 issue, *i. e.*, that (1) only four flights were involved which would not create undue competition, and (2) there was not time to have a certification hearing.

It does not appear that the Board's attention was directed in the *Greenbelt* cases to the question of whether the groups going on the flights were charterworthy. The Board merely noted, without more, the allegations of the exemption application with respect to *bona fides* of the membership of the proposed travellers in the charter organizations. Although those allegations might well draw some response from the Board today in the light of the order now under review, we have to agree that all the *Greenbelt* cases tend to prove is that the Board, absent the prod of adversary proceedings, is perhaps not as alert as it might otherwise be to validate the Congressional concern for the integrity of individualized transportation.

The Board asserts, with apparent accuracy, that it has never in its history ruled that stockholders of publicly held business corporations are charterworthy. TIA, so it is said, is the first to raise the claim that they are; and the Board

---

6. Standard Airways, Inc. Exemption, C.A.B. Orders E–24956 and E–25947 (1967). Standard Airways, a supplemental air carrier, sought an exemption for a charter flight to the Bahamas because that destination was not within the operating authority covered by its certificate. The allegations in Standard's application were not contested by anyone, nor was there any opposition to the exemption sought.

7. In this later connection, the Board now notes that the Greenbelt members were shown by the record in that case to have participated in organized social gatherings and activities sponsored and provided by the cooperatives. In its order under review here, the Board stressed the fact that shares in the cooperatives were not freely transferable, and holdings were limited to one share per person.

points to this fact, as well as to the assumption contained in the letter from Delta, Note 3, *supra,* as evidencing a common understanding within this regulated industry that corporate stockholders as such are not open to charter solicitation.[8] The Board has declared the charter eligibility of such organizations as the National Amateur Golfers Association, Eastern-National v. Trans International, 41 C.A.B. 765 (1964), and the Catholic War Veterans, Capitol Airways, Charter Exemption, 38 C.A.B. 1083 (1963). It has turned down the New York City Parent-Teachers Association, *Eastern-National, supra.*

The Board in the order under review emphasized the ease of access to the status of corporate shareholding in a company like Transamerica, but it disclaimed reliance on this fact alone. It remarked that, in the last analysis, decisions in the area of group affinities appropriate for charter qualification inevitably and inescapably involve "the exercise of judgment * * * within the framework of the charter concept and our regulations as to whether group or individual travel is involved—whether solicitation is to the general public or whether it is a restricted group with a well-defined affinity."

We think the Board is right in this perception of the essential nature of its task, and we cannot say that the immediate exercise of judgment challenged here is so wanting in either rationality in general, or relationship to existing written regulations in particular, as to justify our intervention. The Congress has admittedly given the Board an exacting assignment in the differentiation of group from individual travel,

but there is no mistaking the legislative purpose that the line be drawn. The demarcation which the Board elects to make has great impact upon the cost and adequacy of the air transportation available to the travelling public—and that is a matter committed in the first instance to the expert and specialized knowledge and experience of the Board. It takes a more compelling record than the one before us to justify our second-guessing the Board in its resolution of a matter of this nature.[9]

The petition for review is

Denied.

---

8. During the pendency of this review proceeding, TIA and other supplemental air carriers have petitioned the Board to initiate rule-making looking towards the amendment of the regulations for the purpose of encompassing stockholder charters. C.A.B. Docket 21255.

9. We are not persuaded by TIA's formulation of its objection to the Board's action in terms of a claim that it amounts

to an amendment of the Board's regulations without the rule-making contemplated by the Administrative Procedure Act. 5 U.S.C. § 551 et seq. TIA itself sought an interpretation of the regulations by its petition for a declaratory ruling; and, in any event, we think the issue presented was well within the scope of the familiar power of an agency to interpret the regulations within the framework of an adjudicatory proceeding.