**PAN AMERICAN WORLD AIRWAYS, INC., and Trans World Airlines, Inc., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 217, Docket 74–1646.**

United States Court of Appeals, Second Circuit.

Argued March 19, 1975.

Decided May 22, 1975.

Harold L. Warner, Jr., New York City, with whom Carl S. Rowe, New York City, Jerry W. Ryan, and Edmund E. Harvey, Washington, D. C., were on the brief, for petitioners.

Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, C. A. B., with whom Thomas V. Heye, Gen. Counsel, C. A. B., O. D. Ozment, Deputy Gen. Counsel, C. A. B., Asst. Atty. Gen. Thomas E. Kauper, Alan R. Demby, Atty., C. A. B., and Carl D. Lawson, Atty., Dept. of Justice, were on the brief, for respondent.

Robert M. Lichtman, Washington, D. C., with whom Robert E. Nagel, Washington, D. C., was on the brief, for National Air Carriers Association, Inc., Capitol International Airways, Inc., Overseas National Airways, Inc., Saturn Airways, Inc., Trans International Airways, Inc., and World Airways, Inc., intervenors.

Before SMITH and TIMBERS, Circuit Judges, and WEINSTEIN, District Judge.[*]

WEINSTEIN, District Judge:

Exercising its rule-making power, the Civil Aeronautics Board (C.A.B. or Board) has authorized supplemental air carriers to operate foreign originating travel group charters. Reg. SPR–74, 39 Fed.Reg. 10886 (1974). Rules of the foreign country must conform to the detailed standards contained in the Board's regulation and there must be a bilateral international agreement authorizing the operation.

Petitioners contend that the standards do not adequately distinguish between individually ticketed services and "charter trips" and that the Board, therefore, has exceeded its statutory authority under the Federal Aviation Act (Act). Fed.Av.Act §§ 101(36), 401(d)(3), and 402(b), 49 U.S.C. §§ 1301(36), 1371(d)(3), 1372(b).

The Civil Aeronautics Board has developed various abbreviations for the terms it uses. By necessity this opinion adopts these symbols set out in the following brief glossary:

| | |
|---|---|
| Advance Booking Charter authorized by foreign government | ABC |
| Inclusive Tour Charter authorized by C.A.B. | ITC |
| Travel Group Charter authorized by C.A.B. | TGC |
| Foreign Originating Travel Group Charter authorized by C.A.B. | TGC/ABC |

### I. Background

Congress amended the Act in 1962 empowering the Board, upon a finding of public convenience and necessity, to certificate air carriers to engage solely in "supplemental air transportation." 49 U.S.C. § 1371(d)(3). This form of transportation is characterized as "charter trips." 49 U.S.C. § 1301(36). See Pub.L. No.87–528, July 10, 1962, 76 Stat. 143, amending the Fed.Av.Act of 1958, 72 Stat. 731, as amended, 49 U.S.C. § 1301 et seq.

The term "charter" is not defined by the Act. It is thus subject to the Board's construction which must maintain the basic distinction between group travel by charter and individually ticketed travel of the sort normally associated with scheduled point-to-point service. See, e. g., American Airlines, Inc. v. C.A.B., 121 U.S.App.D.C. 120, 348 F.2d 349, 354 (1965); American Airlines, Inc. v. C.A.B., 125 U.S.App.D.C. 6, 365 F.2d 939, 943–45 (1966); Pan American World Airways, Inc. v. C.A.B., 380 F.2d 770, 779 (2d Cir. 1967), aff'd by an equally divided Court sub nom. World Airways, Inc. v. Pan American World Airways, Inc., 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748, reh. denied, 393 U.S. 956, 89 S.Ct. 370, 21 L.Ed.2d 369 (1968); Trans International Airlines, Inc. v. C.A.B., 139 U.S. App.D.C. 174, 432 F.2d 607, 609 (1970); Saturn Airways, Inc. v. C.A.B., 157 U.S. App.D.C. 281, 483 F.2d 1284, 1287 (1973). As the court put it in American Airlines,

[*] Jack B. Weinstein of the United States District Court for the Eastern District of New York, sitting by designation.

Inc. v. C.A.B., 123 U.S.App.D.C. 120, 348 F.2d 349, 354 (1965), "[T]he Board should be free to evolve a definition in relation to such variable factors as changing needs and changing aircraft . . . ."

Acting pursuant to this authority, the Board has recognized various types of charters. There are "single entry" charters in which an aircraft is engaged by one person for the transportation of others who pay nothing. There are charters in which a group charters an aircraft for its own use, each participant sharing equally in the cost. Groups having some prior "affinity" or interest may travel together or "spontaneous" groups of persons without a prior community of interest may band together specifically for the purpose of travel. Even split charter rules, permitting the chartering of one-half of an aircraft to each of two unrelated groups, have been recognized. American Airlines, Inc. v. C.A.B., 123 U.S.App.D.C. 120, 348 F.2d 349 (1965).

The Board has also provided for inclusive tour charters (ITC). These flights are chartered by an independent tour operator who markets a travel package consisting of air transportation, accommodations, and other ground arrangements to members of the general public. The tour is offered at a single package price and the tour operator bears the commercial risk of unsold seats. 14 C.F.R. Part 378 (1974). As noted in some detail in Part III B infra, the Board's ITC authorization was ultimately upheld by Congress.

Charter service is inherently less expensive to individuals than conventional service because the capacity of an aircraft is used and the cost can be spread among more passengers than in scheduled service, where planes usually fly with less than full planeloads and the costs are borne by fewer passengers. Over the years, the most widely used type of charter has been that of "affinity" groups. The Board's regulations contain numerous technical restrictions designed to insure that the participants are drawn from a bona fide club or organization existing for purposes other than travel, since in this type of charter such affinity is the tool utilized by the Board to maintain the distinction between group travel and individually-ticketed service. See 14 C.F.R. § 207.40 (1974).

Affinity charters have "proven to be discriminatory in application and difficult in enforcement." Saturn Airways, Inc. v. C.A.B., 157 U.S.App.D.C. 281, 483 F.2d 1284, 1292 (1973). They tend to discriminate against members of the public who do not belong to qualified organizations with a membership large enough to successfully mount a charter program. Additionally, wide abuses of the affinity rules developed over the years; spurious organizations were formed, composed of individuals, otherwise unrelated to one another, who were brought together essentially at the time of flight, solely to pretend to conform to the rules under which low cost transportation was made available. See C.A.B. v. Carefree Travel, Inc., 513 F.2d 375 (2d Cir. 1975). The charter rules lacked common acceptance among passengers because it was not clear to them why the test for eligibility for low cost transportation was membership in a group which had nothing to do with transportation. See Keyes, The Transatlantic Charter Policy of the United States, 39 J. Air L. & Com. 215, 239 (1973); Diederich, Protection of Consumer Interests Under the Federal Aviation Act, 40 J. Air L. & Com. 1, 13 (1974); Lichtman, Regularization of the Legal Status of International Air Charter Services, 38 J. Air L. & Com. 441, 450 (1972).

To meet affinity charter problems, the Board established travel group charters (TGC), a service based upon eligibility requirements other than organization membership. It is designed to provide a more appropriate means of maintaining the distinction between charter and individual service. Reg. SPDR–22, 36 Fed. Reg. 2514, 2515 (1971).

TGC rules were adopted by the Board in 1972. 14 C.F.R. Part 372a (1974).

The essence of a TGC is that a group of forty or more persons may contract with an air carrier to hire all or part of an aircraft for round-trip transportation for a trip lasting at least seven days in North America or at least ten days elsewhere in the world. Under the rules, the cost of the trip is borne by the charter participants on a *pro rata* basis. TGCs are arranged by a "charter organizer," defined as one engaged in the formation of the group, who acts as the group's agent with respect to the contract with the air carrier and who is regulated as an "indirect air carrier." Contained in the regulations governing the formation of travel groups and the transportation involved are detailed provisions designed to maintain a distinction between group and individually-ticketed travel. *See* 14 C.F.R. § 372a.10–.18 (1974).

Several scheduled carriers, including the present petitioners, vigorously opposed the promulgation of the TGC rules, and appealed the Board's decision. Saturn Airways, Inc. v. C.A.B., 157 U.S. App.D.C. 281, 483 F.2d 1284 (1973). Many of the arguments made in the present proceeding were also addressed to the *Saturn* court. The carriers contended that the rules did not adequately differentiate between scheduled and charter service, that TGCs would directly compete with, rather than supplement, scheduled service, and that the Board had improperly abolished "prior affinity" as a charter requirement. Each of these arguments was rejected. *Id.* at 1291–93. The court concluded that the TGC rules "maintain the necessary distinction between group and individually ticketed travel, and that they are the result of painstaking and reasoned analysis by the Board." *Id.* at 1292. It recognized that "organization membership" is not necessary to insure the distinction between individually ticketed and charter services, and "is not a *sine qua non* for legality." *Id.* at 1293.

Concern about traditional affinity rules which had motivated the Board to adopt the TGC regulations had been shared by the regulatory authorities of many foreign governments. A few had been considering adoption of "nonaffinity" rules differing from the Board's TGC rules. During the pendency of proceedings culminating in the adoption of the TGC rules, several United States and foreign air carrier participants had argued for the adoption of special rules with respect to foreign originating TGCs, permitting charters to be operated in conformance with the originating country's rules governing TGCs (or their counterparts, however designated), so long as the foreign country's rules were substantially similar to those ultimately prescribed by the Board. SPDR–33, 38 Fed.Reg. 24664, 24665 (1973). At the time the Board adopted the TGC rule, however, no foreign government had moved to implement comparable charter regulations "and the Board therefore considered it premature to attempt then to prescribe standards for determining whether another country's future rules would be substantially similar to ours." *Id.* At the same time the Board indicated an open mind on the question. It did

> "express agreement in principle with the merits of the proposed 'law of the country of origin' approach, and indicated its willingness to deal with the matter later, in light of future developments in the international air transportation community, and to take appropriate implementing action—by amending our rules, granting waivers, or otherwise—giving due consideration to the interests of the public and the various competing classes of carriers."

*Id.*

Following the Board's adoption of its TGC rules in 1972, the United Kingdom announced its intention to adopt an Advance Booking Charter (ABC) rule, embracing a comparable concept. Shortly thereafter, representatives of the governments of the United States, Canada, and the twenty member states of the European Civil Aviation Conference, met

in Ottawa, Canada, and in October, 1972, issued a joint Declaration of Agreed Principles for North Atlantic Charter Flights (Ottawa Principles). The Ottawa Principles were developed as a predicate, during a period of experimentation with non-affinity charter concepts, for

"a generally agreed framework which will permit all North Atlantic states to establish similar charter rules with respect to the new non-affinity class of air charters that will facilitate and regularize their operations on North Atlantic air routes."

Department of State Press Release No. 296, December 1, 1972, quoted in Reg.No. SPR–74, 39 Fed.Reg. 10886 (1974). In announcing acceptance by the United States of the Ottawa Principles, the Department of State stated:

"Adherence to the Declaration signifies our intention to permit the operation to and from the United States of foreign originating charters marketed under national rules consistent with the Declaration but differing from our *pro-rata* regulations. To this end, we are prepared to undertake discussions with other interrelated authorities, at an appropriate early date, to arrive at [a] mutually agreeable regime for particular bilateral flows and to ensure fully reciprocal treatment for U.S.-originating TGC flights."

*Ibid.* (emphasis omitted).

A number of foreign governments adopted their own charter regulations, based upon the Ottawa Principles, incorporating restrictive features similar, but not identical, to the United States TGC rules. Moreover, in accordance with the Ottawa Principles, bilateral "Memoranda of Understanding" were concluded between the United States, on the one hand, and the United Kingdom, the Netherlands, the Federal Republic of Germany, France, and Ireland, on the other hand. Reg.No.SPR–74, 39 Fed. Reg. 10886 (1974). Each memorandum provided that both signatory parties would accept as "charterworthy" traffic "originated in the territory of the other

Party" and organized and operated "pursuant to the advance charter (TGC or ABC) rules of that Party." *Id.* at 10887. The bilateral memoranda with France, the Federal Republic of Germany and the United Kingdom further provided that the United States' regulatory authorities would "[b]egin and conclude, as soon as practicable, rule-making procedures to implement acceptance of the advance booking charter (ABC) rules" of the other party. *Id.*

## II. *Adoption of the TGC/ABC Rule*

In light of these multilateral and bilateral international actions, the Board instituted a public rule-making proceeding in September, 1973, to consider amending the TGC rules to authorize United States and foreign scheduled and supplemental carriers to perform TGC/ABCs organized in compliance with the rules of the country of origin. It was noted that (1) the foreign rules must be substantially similar to ours, and (2) there would have to be a formal agreement between the country of origin and the United States with respect to the charterworthiness of such operations. SPDR–33, 38 Fed.Reg. 24664, 24665 (1973).

In instituting the rule-making proceeding, the Board underscored the fact that its then TGC rules were not acceptable to foreign governments and that a viable international air transportation policy required the cooperation of foreign countries. It declared:

"In reaching our conclusion to modify the inbound charter rules, we have given great weight to the fact that the pro rata characteristic of our TGC rule appears to be unacceptable to a number of foreign governments for charters originating in their territory. Our insistence on this one requirement, regardless of the country of origin or the flag of the carrier, could thus result in effectively aborting the TGC experiment. Moreover, as a general principle, we are mindful that the international aviation system cannot maintain its viability if every government rigidly insists on imposing its

own regulatory concepts on other sovereign states. Our approach here, which is designed, as a matter of comity, to recognize the validity of rules of foreign governments for charters originating in their territory, while maintaining our own rules for charters originating in this country, represents a reasonable accommodation of the divergent viewpoints of various sovereign members of the international aviation community in dealing with a common problem."

SPDR–33, 38 Fed.Reg. 24664, 24666 (1973).

United States scheduled carriers opposed the proposed amendment to the TGC rules. Supplemental and foreign carriers supported it.

In March, 1974, upon consideration of the filed comments, the Board adopted TGC/ABC rules. It concluded that the "restrictions and conditions we are specifying with respect to foreign-originated ABC's [are] not normally an incident of individually ticketed service, and the cumulative effect of the set of restrictions adequately precludes the use of TGC/ABC charters as a guise for individually ticketed service." Reg.No.SPR–74, 39 Fed.Reg. 10886, 10888 (1974). In particular, the Board pointed to the following four restrictions which are not a part of individually ticketed service:

> "(a) The participants in each TGC/ABC group must travel together on both outbound and inbound portions of the trip. . . .
>
> (b) At least ninety days in advance of flight departures, TGC/ABC participants are contractually bound to pay for a specifically identified flight. . . .
>
> (c) A TGC/ABC must be a 'round trip', including both a departure and return flight. . . .
>
> (d) There is a minimum-stay requirement for TGC/ABC participants. . . ."

*Ibid.*

The TGC/ABC rule became effective on April 22, 1974. Foreign originating charters are now being operated pursuant to it.

### III. *Petitioner's Contentions*

■ Review of the Board's regulation by this court is authorized. 49 U.S.C. § 1486(a). Regulations promulgated by an agency without a prior evidentiary hearing are directly reviewable in situations "where evidence has been assembled before the agency and is not challenged, and where the issues presented are legal and not factual." Deutsche Lufthansa Aktiengesellschaft v. C.A.B., 156 U.S.App.D.C. 191, 479 F.2d 912, 916 (1973). *See also* Mobil Oil Corp. v. Federal Power Comm., 152 U.S.App.D.C. 119, 469 F.2d 130, 139–142 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159, reh. denied, 414 U.S. 881, 94 S.Ct. 35, 38 L.Ed.2d 129 (1973); City of Chicago v. Federal Power Commission, 147 U.S.App.D.C. 312, 458 F.2d 731, 740–41 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); Environmental Defense Fund v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1099 and n. 27 (1970). *Cf.* Currie & Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum.L.Rev. 1, 41–43 (1975).

Petitioners contend (1) that TGC/ABC operations are outside the charter concept contemplated by Congress; (2) that charter participants may not be solicited from the general public; and (3) that TGC/ABC air transportation is not "supplemental" within the Act. None of these arguments is persuasive.

### A. *TGC/ABC Operations Are Within the Statutory Charter Concept*

The term "charter trip" has been in the statute since its enactment as the Civil Aeronautics Act of 1938. Section 401(e)(6) and its predecessor authorized the scheduled carriers to perform off-route "charter trips and special services." Prior to 1962, however, the Act contained no definition of supplemental air transportation and no specific provision for Board authorization of carriers to

perform it. At that time Congress took the supplemental air carrier problem in hand. The Act was amended to define supplemental air transportation as "charter trips in air transportation" and to empower the Board to issue certificates of public convenience and necessity authorizing such transportation. 49 U.S.C. § 1301(36).

This legislation reflected a decision by Congress that the supplementals should not be permitted to perform "individually ticketed" service. Supplemental air carriers were at that time performing regularly scheduled service which, but for quantitative restrictions, was identical to conventional scheduled service. There were no requirements that participants be contractually bound to pay for a specific flight well in advance of the flight departure or that advance deposits be paid. Nor were there any mandatory round-trip or minimum stay restrictions much less requirements that passengers travel as part of a specific group. As matters then stood, an individual desiring to go from A to B could consult the published schedules of one or more supplementals operating between A and B, as well as those of regularly scheduled airlines serving the same points, choose the carrier and flight he pleased, pay the fare, and fly the same day.

While foreclosing further individually ticketed service by the supplementals, Congress agreed with the Board that these carriers should have an important place in the air transportation system. Chartered flights were to be their distinguishing method of operation. Although it did not define the term charter, it did provide the Board with some guidance:

The Board should never permit "individually ticketed service to be offered to the general public under the guise of charter." S.Rept. No. 688, 87th Cong., 2d Sess. (1961), 1 U.S.Code Cong. & Admin.News pp. 1844, 1852 (1962). The touchstone is simply that charter service must be "of a kind and character which does not amount to conventional . . service as provided by the major airlines.". S.Rept.No. 1567, 86th Cong., 2d Sess. 5 (1960).

In Saturn Airways v. C.A.B., 157 U.S.App.D.C. 281, 483 F.2d 1284 (1973), the court found that the TGC concept constituted a lawful evolution of the charter definition. It stated that it was impressed with several " 'substantial and vital' differences between TGCs and conventional travel that have been stressed by the Board in its argument before us," and it concluded that such differences effectively "maintain the necessary distinction between group and individually ticketed travel." *Id.* at 1292. Although we are not bound by the decision or the rationale of the *Saturn* court, we do find much of its reasoning persuasive.

Possibly petitioners chose to appeal the Board's ruling with respect to TGC/ABCs in this Circuit in the hopes of finding a court more inclined toward their view. Such "forum shopping" should be discouraged. While we do view the issues from a fresh and unbiased viewpoint, we are cognizant of Congressional intent to set a national policy with regard to charter flight operations. *See* House Rept. No. 1639, 90th Cong., 2d Sess. (1968), 3 U.S.Code Cong. & Admin. News p. 3594 (1968). *Cf.* Commission on Revision of the Federal Court Appellate System, Structure & Internal Procedures: Recommendations for Change, 21, A–153–155 (1975).

Petitioners' position is essentially that by permitting TGC/ABCs where the regulations of the country of origin are only substantially in accord with the Board's TGC regulations, the challenged amendments authorize a form of charter service which fails to maintain the "substantial and vital" differences from conventional service noted in *Saturn Airways.* They point out that under the TGC/ABC amendments (1) charter participants are not required to be a party to the charter contract itself, incurring liability for the pro rata share of the charter costs; (2) TGC/ABC participants are not necessarily required to pay nonrefundable depos-

its; and (3) there is not necessarily a risk of flight cancellation up to 45 days prior to scheduled departure because of defaults by fellow charter participants. The petitioners argue that such restrictions are indispensable, and that the remaining restrictions and conditions specified in the TGC/ABC amendment are not sufficient to provide any practical basis for differentiation between the sale of individually ticketed transportation and the sale of charter transportation.

In affirming the TGC regulations, however, the court in *Saturn Airways* did not hold that each of the TGC restrictions specifically noted was necessary to maintain the distinction between TGC and individually-ticketed services. Rather, the court's focus was on the cumulative effect of the entire set of restrictions, and it simply listed certain factors and restrictions which contributed to its ultimate determination. While the TGC/ABC amendment eliminates certain restrictions which the Board imposes on United States-originating TGCs and which were noted by the court in *Saturn*, the amendment maintains other TGC restrictions. Added are new conditions even more restrictive than those in the TGC rules. SPDR–33, 38 Fed.Reg. 24664, 24666 (1973). Viewed as a whole, the various restrictions and limitations imposed in the Board's regulation maintain substantial and vital differences between TGC/ABC service and conventional service available to the individual traveler. These distinctions include the following:

1. At least 90 days in advance of flight departure, TGC/ABC participants are contractually bound to pay for a specifically identified flight. Individually ticketed travelers, on the other hand, need not incur any contractual obligation prior to the flight. They are free to reserve, change their reservations, and cancel when they please.

2. There are other substantial restrictions, which limit passenger flexibility. All TGC/ABC participants must go and return together as a group. There can be no intermingling of passengers from different groups and no one-way passengers. Moreover, TGC/ABC participants are subject to predetermined fixed restrictions on the length of their trips. In sharp contrast, no restrictions are placed on an individually ticketed traveler. Such a passenger may purchase a one-way or round trip ticket. He need not be "locked" into any specified length of stay or date of return. The individually ticketed passenger can cut short his trip, extend it, make up his mind when to return after he reaches his destination, or decide not to return at all.

3. The TGC/ABC restrictions necessitate a significant risk of flight cancellations up to the date of departure. Each TGC/ABC contract must cover at least forty seats and generally will involve a substantially greater number. Participants must be drawn exclusively from the list of "actual participants" (persons contractually bound to pay for a specifically identified flight at least ninety days in advance of flight departure) or the list of "standbys" (eligible list of substitute participants formed not less than 90 days in advance of the flight whose number cannot exceed the number of seats contracted for on non-prorated TGC/ABC flights). If substantial numbers of participants default or cancel and cannot be replaced by "standbys", the charterer can choose to abort the flight rather than incur a financial loss. Thus, while the TGC/ABC rules do not mandate flight cancellation under specified circumstances, neither do they forbid contractual provisions authorizing cancellations. In contrast, the individually ticketed passenger faces no such uncertainty.

**B. Solicitation From the Public Is Not Inconsistent With the Statutory Charter Concept**

Petitioners argue that the legislation authorizing supplemental air transportation prohibits charters from being solicited, either directly or indirectly, from the general public. In support of this contention, they note that during the floor

debate leading to enactment of the supplemental legislation in 1962, certain members of Congress expressed the view that the legislation would exclude from the charter concept any arrangement under which one could charter an aircraft from a supplemental and thereafter resell the space to individual members of the general public. *See, e. g.,* 108 Cong. Rec. 12284–85 (1962). Petitioners further note that some of these statements were relied upon in Pan American World Airways v. C.A.B., 380 F.2d 770, 780–82 (2d Cir. 1967), aff'd by an equally divided court sub nom. World Airways, Inc. v. Pan American World Airways, Inc., 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748, reh. denied, 393 U.S. 956, 89 S.Ct. 370, 21 L.Ed.2d 369 (1968).

Following the Board's authorization of ITCs, which do involve solicitation from the general public, the Court of Appeals for the District of Columbia, in American Airlines, Inc. v. C.A.B., 123 U.S.App. D.C. 310, 365 F.2d 939 (1966), held that ITCs fell within the definition of the term "charter" in the 1962 amendment to the Act. In so holding the court stressed that the restrictions the Board had placed on ITCs would prevent the evils feared by those who had spoken against charter and public solicitation by the charterer; that the restrictions did result in a kind of service different from conventional airline service; and, hence, that ITCs "[comport] with the overall statutory intention of Congress". *Id.* at 948.

■ A year later, this court, relying on the statements which had failed to sway the District of Columbia Circuit, reached the opposite conclusion. Pan American World Airways v. C.A.B., 380 F.2d 770 (2d Cir. 1967), aff'd by an equally divided court sub nom. World Airways, Inc. v. Pan American World Airways, Inc., 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748, reh. denied, 393 U.S. 956, 89 S.Ct. 370, 21 L.Ed.2d 369 (1968). When the Supreme Court failed to resolve the conflict, Congress promptly solved the problem by amending the definition of "supplemental air transpor-

tation" to include ITCs. 49 U.S.C. § 1301(36). In so doing, it emphasized that the Board's power was "clarified", not enlarged. *See* House Rept. No. 1639, 90th Cong., 2d Sess. (1968), 3 U.S.Code Cong. & Admin.News p. 3594 (1968). It was the judgment of Congress, therefore, that the Board has always had the statutory power to authorize ITCs. Congress concluded that public solicitation was not inconsistent with the term "charter" in the definition of supplemental air transportation so long as the service was different in significant respects from conventional airline service. *Ibid.*

Organization "affinity" or other restrictions on public solicitation are "not statutorily required, but only a vehicle to insure that charter travel [does] not become a guise for individually ticketed services." Saturn Airways, Inc. v. C.A.B., 157 U.S.App.D.C. 281, 483 F.2d 1284, 1293 (1973). And, as we have shown, the passengers on TGC/ABC flights are subject to a complex of restrictions which maintain the necessary distinction.

### C. *TGC/ABC Service Is Supplemental Air Transportation*

■ Pan American and TWA contend that TGC/ABCs are not "supplemental air transportation" because they do not supplement the service by the scheduled airlines. 49 U.S.C. § 1301(36). They claim that TGC/ABC service competes directly with petitioners' scheduled services. There is, however, nothing in the statute which precludes competition between the supplementals and the scheduled airlines or which relegates the supplementals to types of service or traffic which the scheduled carriers are unwilling or unable to provide. For example, scheduled airlines are authorized to engage in interstate and foreign air transportation on both a scheduled and a charter basis. *See* Interagency Steering Committee, Statement of International Air Transportation Policy, approved by The President, 6 Weekly Compilation of Presidential Documents 804 n. 2 (1970). The legislative history of the 1962

amendments of the Act indicates that the supplementals are not "second class," but that they are to provide the public with "convenient and adequate air transportation" and "achieve a permanent and stable place in our air transportation system." Sen.Rept. No. 688, 87th Cong., 2d Sess. (1961), 1 U.S.Code Cong. & Admin.News pp. 1844, 1855, 1851 (1962).

Courts as well as the Board have recognized that the Act contemplates competition between supplemental and scheduled airlines. In National Air Carrier Association v. C.A.B., 143 U.S.App. D.C. 140, 442 F.2d 862, 872 (1971), for example, the court declared that "the existence of a market structure conducive to maximum feasible competition" between scheduled and supplemental carriers "is the highest and best definition of both our national and consumer interest in the conditions under which international air transportation is to be carried on." *Cf.* National Air Carrier Association v. C.A.B., 141 U.S.App.D.C. 31, 436 F.2d 185, 194, 197 (1970).

The Board, as the agency charged with administering the Act, has ruled that the scheduled carriers' view of the supplementals' role is erroneous. In the Transatlantic Supplemental Charter Authority Renewal Case, CCH Aviation Law Rep. ¶ 22,067.01, p. 14,116 (1972), the Board found that contentions of TWA and Pan American, similar to those made here, were "fundamentally inconsistent with our outlook on the relationship between charter and scheduled carriers." It stated:

> "Our approach recognizes that both scheduled and charter services are integral elements of international air transportation fulfilling a legitimate and vital role, and that scheduled carriers and supplementals each have a right to compete for transatlantic bulk traffic."

*Ibid.* Similarly, in its TGC rulemaking, the Board concluded that

> "the requirement of Section 101(34) [as amended, § 101(36)], of the act that the charter services 'supplement the scheduled service' permits the Board to

authorize charter services which it finds are a desirable adjunct to the overall system."

Reg.No.SPR–61, 37 Fed.Reg. 20808, 20810 (1972).

The Board, on the basis of past experience, was able to find that TGC/ABC flights would be a valuable adjunct to existing methods of supplying the needs of international air travelers. Recognition of the necessity to protect the scheduled services against substantial impairment does not mean that their profitability must be at the level or under the conditions they desire. As one commentator observed, the sole purpose of charter regulations is not to totally insulate the scheduled carriers from any encroachment:

> "The old system of air travel, in which scheduled services built around the needs of business travelers were predominant, cannot meet the needs of this new age. What is needed now is a balanced system of air transportation, in which both scheduled and charter service must play an important role, and in which charter services have an assured status by virtue of international agreements."

Lichtman, Regularization of the Legal Status of International Air Charter Services, 38 J. Air L. & Com. 441, 464 (1972).

The supplementals have played a significant role in transforming the North Atlantic into a mass travel route characterized by a three-fold growth between 1962 and 1969 and an average rate of increase of 16.4% per year from 1968 to 1973. *See* Transatlantic Supplemental Charter Renewal Case, CCH Aviation Law Rep. ¶ 22,067.01, p. 14,115 (1972); C.A.B., U.S. Int. Pass. Movements on Charter Flights, 1968–1973 at 30 (rev. ed. 1974). Expansion of the transatlantic charter traffic has been accompanied by a swift rise in scheduled traffic. Keyes, The Transatlantic Charter Policy of the United States, 39 J. Air L. & Com. 215, 235 (1973). As of the end of 1973, three-quarters of the transatlantic passenger market was scheduled. C.A.B., U.S. Int.

Pass. Movements on Charter Flights, 1968–1973 at 30 (rev. ed. 1974). There has also been a corresponding increase in the United States share of the market's total traffic from under 38 per cent in 1962 to about 50 per cent in 1973. Transatlantic Supplemental Charter Renewal Case, CCH Aviation Law Rep. ¶ 22,067.01, p. 14,115 (1972); C.A.B., U.S. Int. Pass. Movements on Charter Flights, 1968–1973 at 33 (rev. ed. 1974).

No evidence has been presented that the TGC/ABC amendment will cause any significant diversion of traffic from the scheduled services. So far as the record shows, the new form of charter may well generate additional traffic from potential travelers for whom conventional scheduled service is prohibitively expensive. The petitioners' prophecy of doom for the regularly scheduled airlines following enactment of the TGC rules never came to pass. In 1973, TGCs accounted for only one per cent of all international passenger charter flights and only one and one-half per cent of United States transatlantic passenger charter flights. C.A.B., U.S. Int. Pass. Movements on Charter Flights, 1968–1973 at 20, 22 (rev. ed. 1974). The Board was, of course, aware of the paucity of TGC traffic when it issued the TGC/ABC amendment, which is essentially ancillary to the TGC rules.

Although charter traffic has increased over the years, see id. at 2, there is no evidence that the TGC/ABC will result in overwhelming movement from other types of charters or from scheduled trips to the TGC/ABCs. The two main types of charters, single entity and pro rata affinity, constituted almost the entire charter market in 1968. Despite gradually expanded use of the ITCs and the creation of four new charter types—study group, overseas military personnel, wet lease, and TGCs—they still accounted for over three-fourths of the charter traffic in 1973. *Id.* at 3–4, 18.

■ Substantial experience with TGC rates enabled the Board to reasonably determine that the proportion of travelers on foreign originating TGCs would

not disrupt the market, and that the continued growth of the supplemental and the scheduled airlines could be anticipated. Because of the demand by the traveling public and the sizeable economic benefits of tourism to the destination countries, courts should take care that their powers of review are not used to discourage experimentation in new charter concepts. *See* Lichtman, Regularization of the Legal Status of International Air Charter Services, 38 J. Air L. & Com. 441, 442–43 (1972); Scoutt & Costello, Charters, The New Mode; Setting a New Course for International Air Transportation, 39 J. Air L. & Com. 1, 24 (1973). In any case, "a month of experience will be worth a year of hearings." American Airlines, Inc. v. C.A.B., 123 U.S.App.D.C. 310, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). If the traffic patterns are not as predicted, the Board remains free to adjust its regulations to unexpected results. *See* Saturn Airways, Inc. v. C.A.B., 157 U.S.App.D.C. 281, 483 F.2d 1284, 1293 (1973).

### IV. *Considerations of International Comity*

We are cognizant of the normal rules requiring courts to give heavy weight to administrative experience and expertise. *See, e. g.,* N. L. R. B. v. United Insurance Co. of America, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963); Moog Industries v. Federal Trade Commission, 355 U.S. 411, 413, 78 S.Ct. 377, 378, 2 L.Ed.2d 370, reh. denied, 356 U.S. 905, 78 S.Ct. 559, 2 L.Ed.2d 583 (1958); Board of Trade of Kansas City v. United States, 314 U.S. 534, 548, 62 S.Ct. 366, 372–73, 86 L.Ed. 432, reh. denied, 315 U.S. 826, 62 S.Ct. 621, 86 L.Ed. 1222 (1942). Congress expected the airlines to be regulated from the CAB in Washington, not from eleven different circuits.

■ In the case before us, there is a special reason for deference. There are at least two jurisdictions involved with

respect to each flight in international air transportation—the United States and the foreign nation to which the traffic is destined or originates. Consequently, the regulatory authority of one nation necessarily can be exercised only with the acquiescence of the other. As a result, there is an obvious need for cooperation, coordination and mutual agreement regarding the regulation of scheduled and charter services among the countries involved in international air transportation. Section 1502 of Title 49 U.S.C. specifically provides that

> "[i]n exercising and performing their powers and duties under this chapter, the Board and the Administrator shall do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country or foreign countries, and shall take into consideration any applicable laws and requirements of foreign countries and the Board shall not, in exercising and performing its powers and duties with respect to certificates of convenience and necessity, restrict compliance by any air carrier with any obligation, duty, or liability imposed by any foreign country . . . ."

*See also* Lichtman, Regularization of the Legal Status of International Air Charter Services, 38 J. Air L. & Com. 441, 443, 455 (1972).

We cannot close our eyes to the fact that these decisions may have an impact on foreign trade and balance of payments. *See* Interagency Steering Committee, Statement of International Air Transportation Policy, approved by The President, 6 Weekly Compilation of Presidential Documents 804–805 (1970).

■ The Board has an obligation to re-examine our policies regularly to guarantee that relevant changes in the international air transportation market are taken into account and that the position of United States scheduled and supplemental carriers in the international charter market is protected. The TGC/ABC amendment, in permitting the

performance of foreign-originating flights marketed under national rules similar to our own, effectively "ensure[s] fully reciprocal treatment for U. S.-originating TGC flights," Reg.No.SPR–74, 39 Fed.Reg. 10886 (1974), and thereby prevents the TGC concept from being aborted.

## V. *Conclusion*

The basic scheme of the TGC/ABC rules provides for a number of restrictive conditions. Taken together, they maintain the required distinction between charter services and that of the regularly scheduled airlines. While these restrictions permit a form of solicitation from the general public, they preserve the character of charter service.

As the court stated in Las Vegas Hacienda, Inc. v. C.A.B., 298 F.2d 430, 432–33 (9th Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1158, 8 L.Ed.2d 286 (1962), the Board has

> "an affirmative statutory duty to exercise its regulatory powers over 'air transportation' so as to foster sound economic conditions, promote economical and efficient service at reasonable charges, and avoid destructive competitive practices."

In refining the definition of "charter" the Board must also consider the effect on international policies in amending its regulations.

Encouragement and development of an economically sound air transportation system taking into account considerations of reciprocity and comity involve meeting the public interest in low cost travel, particularly in the transatlantic market. It is often difficult to precisely determine the public interest:

> "[This term] when applied by the Board in concrete situations may not be narrowed to only the interests of a given group, but must also take into account the present and *future* needs of the *entire* country. The potential for antagonism between the interests of a finite group and the perceived national interests is obvious. The

Board must moderate its actions to consider both, but must ultimately determine an issue in favor of the broader interests and in light of the statutory objectives supplied by the Act."

Diederich, Protection of Consumer Interests Under the Federal Aviation Act, 40 J. Air L. & Com. 1, 28 (1974) (original emphasis).

In view of the Board's expertise, the supporting data, and the substantiality of the various restrictions relied upon, its decision is not in violation of any statute or of congressional policy. The petition for review must be denied.